

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

February 19, 2025

<u>BY ECF AND EMAIL</u>
The Honorable Katherine Polk Failla
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

     **Re:**    ***United States v. Kofi Amankwaa*, 24 Cr. 549 (KPF)**

Dear Judge Failla:

     Defendant Kofi Amankwaa is scheduled to be sentenced on February 26, 2025, at 3:00 p.m., having pleaded guilty to Count One of Information 24 Cr. 549 (KPF) (the "Information"), which charged Amankwaa with immigration fraud, in violation of Title 18, United States Code, Sections 1546(a) and 2. The parties have stipulated to an applicable range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") of 70 to 87 months' imprisonment (the "Stipulated Guidelines Range"). For the reasons discussed below, a sentence within the Stipulated Guidelines Range is warranted.

## I.    <u>Background</u>

###    A.    **Relevant Regulatory Scheme**

     An individual without lawful status in the United States can apply to become a lawful permanent resident ("LPR") by submitting a Form I-485 LPR petition that establishes his or her eligibility for LPR status. (*See* PSR ¶ 13.) A petitioner may be eligible for LPR status if he or she is an immediate relative of a U.S. citizen, the U.S. citizen relative meets certain age or marriage requirements—including a child who is over the age of 21—and the U.S. citizen relative files a Form I-130 "petition for alien relative" establishing such a relationship. (*Id.* ¶¶ 13, 16.) Even where such a relationship is established, however, an LPR petitioner must also show that he or she lawfully entered the country. (*Id.* ¶ 17.) Thus, where an LPR petitioner has a qualifying U.S. citizen relative, but illegally entered the country, he or she is generally not eligible for LPR status.

     The requirement that an LPR petitioner establish a lawful entry into the United States, however, has certain exceptions. One exception is where an LPR petitioner is eligible for LPR

status under the Violence Against Women Act ("VAWA"). (*See id.*) In particular, an individual may be eligible for LPR status—regardless of the existence of a prior lawful entry into the country—if he or she establishes, through a Form I-360 VAWA petition, that he or she was "abused" by an immediate U.S. citizen relative, including, as relevant here, a child over the age of 21. (*Id.* ¶¶ 13-14.) "[A]bused" is defined as "battered or subject to extreme cruelty." (*Id.* ¶ 14.)

As relevant here, an LPR petitioner may file a petition for an "advance parole" travel authorization (a Form I-131), which, if granted, enables the petitioner to leave the United States temporarily and lawfully re-enter the country while the petitioner's Form I-485 LPR petition is pending. (*Id.* ¶ 15.) The advance parole travel authorization requires that the petitioner's temporary travel be for "urgent humanitarian reasons" or in furtherance of a "significant public benefit," which may include a "personal or family emergency or bona fide business reasons." (*Id.*)

## B.       Offense Conduct

From at least September 2016 through November 2023, Kofi Amankwaa, then a licensed attorney based in the Bronx, New York, orchestrated a massive immigration fraud scheme that involved the filing of over three thousand fraudulent petitions under VAWA, in exchange for over $13 million in attorney's fees (the "VAWA Scheme"). (*See* PSR ¶¶ 10, 19, 139.) The filing of a fraudulent VAWA petition—which falsely stated that the petitioner was abused by the petitioner's U.S. citizen child or another close family member—was the first step in a multi-step process designed to obtain LPR status, among other immigration benefits, for the client. (*See id.* ¶ 23.) As described further below, Amankwaa used a fraudulent VAWA-based LPR petition to obtain an advance parole travel authorization for clients who had illegally entered the United States; instructed the clients to leave the United States and return using their advance parole travel authorization; and then used the client's fraudulently-obtained parole into the United States, in combination with an I-130 petition for an alien relative, as a basis for a new LPR petition. (*See id.*) In this way, Amankwaa sought to fraudulently circumvent the general requirement that an LPR petitioner have previously lawfully entered the United States.

### 1.       The First LPR Application Package

For a particular client, Amankwaa typically began the VAWA Scheme process by conducting an in-person meeting with the client—usually a Mexican national without lawful status in the United States—who was seeking to obtain LPR status, and/or with the client's family members, at Amankwaa's law office in the Bronx. (*See, e.g.*, PSR ¶¶ 26, 34, 42, 44.) At that meeting, Amankwaa or one of his employees provided the client with a list of documents, information, and required payments that the client needed to provide Amankwaa to begin the LPR process. (*Id.* ¶¶ 26, 49.) Among other things, Amankwaa informed the client that the LPR process would cost $6,000 in legal fees for Amankwaa (payable in two installments of $3,000), plus a $1,225 immigration filing fee, among other expenses, including $325 for a required medical examination. (*See, e.g., id.* ¶¶ 24, 26.) As a general matter, during this initial meeting and continuing thereafter, Amankwaa did not advise the client that his LPR process involved a VAWA petition or any other document involving domestic abuse allegations, nor did Amankwaa ask the client whether the client had ever been the subject of domestic abuse. Amankwaa generally only

discussed the false abuse allegations with a client only if the client later learned of the VAWA fraud from another source during the process and confronted Amankwaa about it.

Following the initial meeting with Amankwaa, the client collected the documents, information, and payments requested by Amankwaa, and then returned to Amankwaa's law office for a second meeting. At this meeting, the client provided Amankwaa or one of his employees with, among other things, the first $3,000 legal fee payment, typically in cash, and a money order for $1,225 to cover the immigration filing fee. Amankwaa or an employee provided the client with a stack of immigration forms and directed the client to sign them. These forms included the Form I-360 VAWA petition, the I-485 LPR petition, and the I-131 advance parole petition, among others. Amankwaa and certain of his employees prepared these forms, and provided them to the client for signing, without first explaining the contents of the forms.[1] The Form I-360 VAWA petition falsely stated, without elaboration or supporting evidence, that the petitioner was abused by his or her U.S. citizen child or, in some instances, by another immediate U.S. citizen relative. (*See id.* ¶ 23.) Each VAWA petition listed Amankwaa as the attorney preparer and contained a preparer's certification attesting, under penalty of perjury, to the truth of the petition. (*Id.* ¶ 11.)

>    2.    Client's Travel to Mexico and Return to the United States

After the advance parole travel petition was approved by United States Citizenship and Immigration Services ("USCIS"), the client, at Amankwaa's direction, flew to Mexico and back to the United States a short time later. (*See id.* ¶¶ 23(ii), 29, 37.) Upon returning to the United States, the client was typically paroled back into the United States. (*Id.*)

In many instances, however, border or immigration authorities at the airport questioned Amankwaa's clients—who, as noted above, typically did not know that Amankwaa had filed documents alleging parental abuse on the clients' behalf—about the clients' pending VAWA petitions. After one such incident, a client and the client's son, who were shocked to learn about the domestic abuse allegations underlying the client's LPR application package from a customs official at the airport, confronted Amankwaa at his law office and surreptitiously recorded the conversation. (*See* Exhibits A (recording) and B (transcript).) During that conversation, Amankwaa explained the VAWA Scheme in detail to the client and the client's son, describing the "abuse petition" as the "remedy" for the problem that the client had entered the country illegally and therefore was generally not otherwise eligible for LPR status. (Ex. A at 5:36-5:46; Ex. B at 3.) When the client's son said that they were upset because Amankwaa had not told them about the abuse petition before then, Amankwaa sought to justify his conduct, stating on the recording: "You are not getting your green card through the abuse petition. We just use that to clean them up for further steps to get your green card." (Ex. A at 8:09-8:42; Ex. B at 4.)

---

[1] Based on the Government's investigation, only after media coverage broke in April 2023 of an incident in which one of Amankwaa's clients was deported after leaving and attempting to re-enter the country on Amankwaa's advice (*see infra* note 2), some of Amankwaa's employees began advising clients of the VAWA process before presenting the clients with immigration forms to sign. Even in those instances, however, clients were not necessarily provided with full or accurate information regarding the requirements of a VAWA petition. (*See, e.g.*, PSR ¶ 50.)

While many of Amankwaa's clients were questioned by authorities at the airport, other clients faced more serious consequences. For example, one client, who had lived in the United States for nearly three decades before seeking to adjust his legal status with Amankwaa, was prohibited from re-entering the United States upon his return from Mexico, resulting in an unexpected family separation.[2]

For the clients who successfully returned to the United States, Amankwaa typically withdrew the client's pending I-360 VAWA petition and accompanying I-485 LPR petition after the client's return. (*See* PSR ¶¶ 23(iii), 30, 38.)

### 3. The Second LPR Application Package

After a client was paroled back into the United States, the client and the client's relative returned to Amankwaa's law office for another meeting. At this meeting, the client paid Amankwaa the second $3,000 legal fee installment, and Amankwaa or a law office employee presented the client with additional immigration forms to sign. (*See id.* ¶¶ 23(iv), 31, 38.) These forms included, among others, a new Form I-485 LPR petition and an I-130 petition for alien relative. (*See id.*) In many instances, the child who filed the I-130 petition to support the parent's LPR petition was the child who was previously listed by Amankwaa as the abuser of the parent on the Form I-360 VAWA petition. (*See id.* ¶¶ 23(iv).)

After the filing of the second LPR application package, the client was required to attend an interview with USCIS. (*See, e.g.*, ¶¶ 32, 40.) In many of these interviews, the immigration officer confronted the client about the previously-filed VAWA petition during the interview, and the client—who often still had not learned about the VAWA petition from Amankwaa—did not know what the officer was talking about. (*See id.* ¶ 32.) In this way, the client learned for the first time—after paying Amankwaa $6,000 and spending thousands of additional dollars on immigration fees, doctor's fees, and flights—that Amankwaa had filed an application falsely alleging that the client was abused by the client's child. Typically, a short time later, the client's LPR petition was denied. (*See, e.g., id.* ¶ 33.)

### 4. The Scope of the VAWA Scheme

According to data obtained from a USCIS Fraud Detection and National Security database, from September 2016 through January 2024, Amankwaa was listed as the preparer of nearly four thousand I-360 VAWA petitions. (PSR ¶ 19.) By contrast, in the previous fifteen years, Amankwaa filed 17 such petitions. (*Id.*)

During the course of the VAWA scheme, over 2,300 VAWA petitions filed by Amankwaa were withdrawn, abandoned, or denied. (*Id.* ¶ 20.) Amankwaa alone was responsible for nearly half of the VAWA petitions that were withdrawn nationwide during that seven-year period. (*Id.* ¶ 21.)

---

[2] *See, e.g.*, Immigrant Family Claims Misleading Attorney Led to Deportation (NBC News 4, Apr. 20, 2023), https://www.nbcnewyork.com/news/immigrant-family-claims-misleading-attorney-led-to-deportation/4260713.

As reflected in the parties' stipulation in the Consent Preliminary Order of Forfeiture, the Government conservatively estimates, based on additional data regarding the number of VAWA petitions filed by Amankwaa alleging that a parent was abused by a child, and the number of such clients who were the beneficiary of a subsequent I-130 petition for alien relative, that the VAWA scheme generated approximately $13,389,000 in fraud proceeds over its seven-year period.

Following numerous complaints, Amankwaa's law license was suspended on November 9, 2023, and Amankwaa was disbarred effective August 29, 2024. (*See* Dkt. 1, ¶ 15; PSR ¶ 11.)

## II.    Procedural Posture

On January 18, 2024, Amankwaa was charged in a two-count Complaint with conspiracy to commit immigration fraud, in violation of 18 U.S.C. § 371, and immigration fraud, in violation of 18 U.S.C. §§ 1546(a) and 2. Amankwaa was presented on that same date before the Honorable Sarah Netburn and ordered released on a $250,000 personal recognizance bond secured by Amankwaa's house, among other conditions.

On September 17, 2024, Amankwaa waived indictment and pleaded guilty, pursuant to a plea agreement, to immigration fraud, in violation of 18 U.S.C. §§ 1546(a) and 2, as charged in Count One of the Information. (PSR ¶ 4.)

The parties and the Probation Office agree on the Guidelines calculation. Pursuant to U.S.S.G. § 2L2.1, the base offense level is 11. (PSR ¶ 11.) Pursuant to U.S.S.G. § 2L2.1(b)(2)(C), because the offense involved over 100 documents, the offense level is increased by nine levels, to 20. (*Id.* ¶ 60.) Pursuant to U.S.S.G. §§ 3A1.1(b)(1), (b)(2), because Amankwaa knew or should have known the victims of the offense were vulnerable victims, and the offense involved a large number of vulnerable victims, the offense level is increased by four levels, to 24. (*Id.* ¶¶ 61, 26.) *See, e.g.*, *United States v. Perez*, 523 F. App'x 842, 844 (2d Cir. 2013) (summary order) (upholding vulnerable victim enhancement in case involving immigration fraud scheme because "[t]he victims were not sophisticated in the area of immigration law" and "their status as undocumented immigrants made it easy for [the defendant] to prey on their desperation to gain legal status without being worried about her victims turning her in to the authorities"); *United States v. Ramirez*, 146 F. App'x 518, 521 (2d Cir. 2005) (summary order) (similar); *cf. also United States v. Archer*, 671 F.3d 149, 169-174 (2d Cir. 2011) (holding that clients of an immigration attorney's fraud on the government may be "victims" under the Mandatory Victim Restitution Act if they were unaware of the fraud). Pursuant to U.S.S.G. § 3B1.3, because Amankwaa abused his position of trust and used a special skill as an immigration attorney in a manner that significantly facilitated the commission of the offense, the offense level is increased by two levels, to 26. (*Id.* ¶ 63.) Pursuant to U.S.S.G. § 3B1.1(a), because Amankwaa was an organizer or leader of criminal activity that involved five or more participants, *i.e.*, employees at his law firm, over the course of the VAWA scheme, the offense level is increased by four levels, to 30. (*Id.* ¶ 63.) After a three-level deduction for acceptance of responsibility, Amankwaa's total offense level is 27. (*Id.* ¶¶ 68-70.)

Amankwaa has a criminal history score of zero and is therefore in Criminal History Category I. (*Id.* ¶ 74.) Accordingly, Amankwaa's Stipulated Guidelines Range is 70 to 87 months' imprisonment. (*Id.* ¶ 127.)

## III.   Discussion

### A.   Legal Framework

Following *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Guidelines continue to provide a critical touchstone. Indeed, while the Guidelines are no longer mandatory, they remain in place, and district courts must "consult" them and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)–(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant;

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B.   A Sentence Within the Stipulated Guidelines Range Is Warranted

Amankwaa abused his position as an immigration attorney to carry out a massive immigration fraud scheme, filing over three thousand fraudulent VAWA petitions alleging that his clients were the victims of domestic abuse. In these circumstances, the Section 3553(a) factors—in particular, the need for the sentence to reflect the seriousness of the offense, promote respect for

the law, provide just punishment, and afford adequate deterrence to criminal conduct, *see* 18 U.S.C. § 3553(a)(2)(A), (B)—warrant a sentence within the Stipulated Guidelines Range.

*First*, a Guidelines sentence is necessary to reflect the seriousness of Amankwaa's conduct, promote respect for the law, and provide just punishment. Amankwaa's crime—immigration fraud—is by its nature a serious offense. *See, e.g.*, *United States v. Dzhamgarova*, 21 Cr. 58 (MKV) (S.D.N.Y. May 21, 2023), Dkt. 154 at 14 (recognizing that asylum fraud was "indeed serious"). While any immigration fraud offense is serious, Amankwaa's crime is especially so. Amankwaa, as a licensed attorney, orchestrated and carried out a large-scale fraud scheme involving over three thousand VAWA applications over a period of at least seven years, resulting in over $13 million in fraud proceeds and more in victim losses. *See, e.g. id.* (recognizing that asylum fraud "especially by an attorney, a licensed attorney, is a serious offense," and that the defendant's offense was "particularly serious because . . . it was complicated, it was contemplated, it was sustained over a period of years"). In doing so, Amankwaa abused his position of trust as an attorney and took advantage of vulnerable victims who were desperate to adjust their immigration status, were not sophisticated in immigration law, and often did not know the English language.

More troubling still, Amankwaa generally did not advise his clients that he was filing fraudulent VAWA petitions on their behalf, as reflected in the illustrative experiences described in the PSR, the victim impact statements submitted concurrently with this submission, and the client recording attached as Exhibit A. As a result, clients were often shocked and dismayed when, for example, they learned of the fraudulent VAWA petitions from immigration or border officials, or from reports in the media. In addition, the nature of the fraud—*i.e.*, a false allegation that the client had been abused by a child or other loved one—was particularly heart-wrenching for the client, and created an additional layer of stress and uncertainty for the client and their family.

In one particularly troubling episode in spring 2023, Amankwaa advised a client to travel to Mexico and return as part of the LPR process, only for the client to be deported upon his attempt to return to the country. (*See supra* note 2.) Amankwaa, however, was not deterred, and continued to carry out the VAWA scheme, including by advising clients to travel on fraudulently-obtained advance parole documents, until his law license was finally suspended in November 2023.

Numerous other clients and family members also suffered emotional and financial distress from Amankwaa's conduct. For example, one client's child states:

> [My mother] jumped on the[] promise to obtain legal status in this country and thus saved just enough money to cover the fees Mr. Kofi Amankwaa and his associates were charging her. Now all seems to be lost as a great deal of her savings were set aside to cover the fees she was charged. She feels cheated, lied to and crushed as her dreams seem to be escaping her.

(*See* Victim Impact Statement ("VIS") 10.)

Another client, a mother of three who left Mexico when she was 17, reports:

> Kofi promised parole to visit Mexico and when we came back we'd
> be able to apply for residency. But that was far from true. He
> accused my child of abusing me without my knowledge or consent.
>
> This crime has impacted me tremendously. There's been a
> lot of times where I couldn't eat or sleep . . . . I feel a lot of sadness,
> despair, and more than anything a lot of fear. . . .
>
> Before going with Kofi I did not have the money to go to
> him but I saved up the amount I needed to go to him. . . . I have no
> other funds to help me stay afloat and am taking this day by day.
> My daughter is [in college] and the money Kofi stole could've been
> allocated to her college fund.
>
> . . . . My outlook on life and hopes have been diminished.

(*See* VIS 15.)

Another client, who has two children and has lived in the United States for 24 years, reports that "all of our savings were decimated due to [Amankwaa's] fraudulent promises," and the "mental anguish and financial devastation we have suffered are profound." (*See* VIS 19.)

In addition to the human toll of Amankwaa's conduct, Amankwaa's conduct constituted a significant fraud on USCIS and severely undermined respect for the federal immigration laws. While any immigration fraud harms the public's faith in the immigration system, a massive immigration fraud committed by an attorney is particularly damaging. Such fraud harms the public's perception of the immigration laws, and also make it more difficult for reputable immigration attorneys to practice. Moreover, Amankwaa's conduct undermined the Violence Against Women Act, which, as relevant here, was intended to protect vulnerable individuals from domestic abuse. And Amankwaa's fraudulent conduct not only undermined the purposes of VAWA; it will undoubtedly make it more difficult for vulnerable individuals who are actual victims of domestic abuse to come forward and use the VAWA law as intended.

In sum, the seriousness of Amankwaa's fraudulent conduct, the need to promote respect for the criminal law, immigration laws, and VAWA, and the need to provide just punishment for a crime that resulted in significant harms to individuals and the government, all call for a significant incarceratory sentence within the Stipulated Guidelines Range of 70 to 87 months' imprisonment.

*Second*, a Guidelines sentence is necessary to afford adequate deterrence to criminal conduct. Although the need for specific deterrence is limited in light of Amankwaa's relatively advanced age and the fact that he has been disbarred, general deterrence is particularly warranted. An attorney's immigration fraud can be difficult to detect and prosecute, because the attorney's clients are reluctant to report the conduct to authorities, given the clients' undocumented status and possible criminal or immigration consequences for them. It is therefore especially important that the sentence imposed in this case send a message to other immigration attorneys who might

consider engaging in similar crimes that doing so will be met with consequences that are commensurate to the seriousness of the crime. While a Guidelines sentence would serve that purpose, a significant downward variance, as requested by Amankwaa, would have the opposite effect and would not sufficiently account for the Section 3553(a) factors described above.

*Third*, a sentence within the Stipulated Guidelines Range of 70 to 87 months' imprisonment would avoid unwarranted sentence disparities among similarly situated defendants. While no two defendants are the same, the Government believes that the Guidelines range of 70 to 87 months' imprisonment appropriately reflects that Amankwaa's conduct warrants a sentence between the sentence of 121 months' imprisonment imposed on an immigration services provider in *United States v. Perez*, 09 Cr. 1153 (MEA), and the sentence of 24 months' imprisonment imposed on an immigration attorney in *United States v. Dzahmgarova*, 21 Cr. 58 (MKV).

In *Perez*, the defendant, like Amankwaa, operated a scheme that defrauded clients of thousands of dollars by falsely claiming that she could get them LPR status and by making false statements on immigration applications. (*See, e.g.*, 09 Cr. 1153, Dkt. 56.) While Amankwaa's conduct was more serious than Perez's in certain respects—for example, the loss amount in *Perez* was less than $1 million, as compared to over $16 million here—Perez's Guidelines range of 121 to 145 months' imprisonment (as calculated in the PSR in that case) was appropriately higher than Amankwaa's because, among other things, Perez was in criminal history category II, received no deduction of points for acceptance of responsibility after going to trial, and was subject to a mandatory consecutive two-year sentence for aggravated identity theft. (*Id.* at 8-9.) Additionally, Perez, unlike Amankwaa, also used the names and other identifying information of certain clients to open credit card accounts and obtain loans in their names. (*See id.* at 8.) Accordingly, the Government agrees that a sentence lower than that imposed in *Perez* is appropriate here.

A sentence that is meaningfully higher than the sentence of 24 months' imprisonment imposed in *Dzahmgarova*, however, is warranted. In *Dzahmgarova*, the immigration attorney defendant was, like Amankwaa, deemed to be an organizer of criminal activity, abused a position of trust, accepted responsibility, and had no prior criminal history. (*See* 21 Cr. 58, Dkt. 154 at 38.) However, it appears that the defendant's conduct in *Dzahmgarova* involved a far lower number fraudulent documents, *i.e.*, between 25 and 99 documents (resulting in a six-level increase rather than the nine-level increase here), as opposed to the thousands of fraudulent VAWA petitions at issue here. (*See id.* at 37.) In addition, certain aggravating factors that are present in this case— in particular, the fact that Amankwaa generally filed the fraudulent VAWA petitions without first advising his clients of the contents of the LPR application package that he was filing—do not appear to have been present in *Dzahmgarova*. (*See* 21 Cr. 58, Dkt. 139 at 3-4.) And in *Dzahmgarova*, unlike here, the defendant did not receive a four-point enhancement for the offense involving a large number of vulnerable victims (or even a two-point vulnerable victim enhancement), which enhancement is undoubtedly appropriate here. (*See* 21 Cr. 58, Dkt. 154 at 38.) Accordingly, the Government submits that a sentence meaningfully higher than the 24-month sentence imposed in *Dzahmgarova*, but lower than the 121-month sentence in *Perez*, is warranted.

*Finally*, the Government recognizes the mitigating circumstances set forth in the PSR and the defendant's sentencing submission, including Mr. Amankwaa's current health challenges and the conditions that may have contributed to his offense conduct. The Government further

acknowledges that Mr. Amankwaa accepted responsibility through a pre-indictment plea. The Government submits that a sentence within the Stipulated Guidelines Range would appropriately balance those factors against the seriousness of Amankwaa's criminal conduct, the need to promote respect for the law, the need for just punishment, and the need to afford adequate deterrence.

## IV.    Conclusion

For these reasons, the Government respectfully submits that a sentence within the Stipulated Guidelines Range of 70 to 87 months' imprisonment is warranted. In addition, the Government respectfully requests that during the sentencing proceeding, the Court orally order forfeiture in the amount of $13,389,000, as reflected in the previously docketed Consent Preliminary Order of Forfeiture. (Dkt. 29.) The Government further requests that the Court postpone the imposition of the parties' Consent Order of Restitution until after sentencing, while the Government continues to collect additional victim information to include in the sealed Schedule A attached to that Order. *See* 18 U.S.C. § 3663(d)(5) (court may determine restitution up to 90 days after sentencing). Finally, the Government respectfully requests that the Court impose a period of two years' supervised release to follow any term of imprisonment, with the special conditions proposed in the PSR, for the reasons set forth at pages 35-36 of the PSR.[3]

Respectfully submitted,

MATTHEW PODOLSKY
Acting United States Attorney for
the Southern District of New York

By: _____
Adam Z. Margulies
Assistant United States Attorney
(212) 637-2345

cc: Todd Spodek, Esq. (via email and ECF)

---

[3] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).

# Exhibit A



*[Exhibit Provided Via Email]*

# Exhibit B

# Unofficial Transcript (May 1, 2023 KOA Recording)

| | |
|---:|:---|
| **Case Name:** | *United States v. Kofi Amankwaa et al.* |
| **Case Number:** | **24 Mag. 230** |
| **Date of Transcription:** | **2/28/24** |
| **Duration:** | **00:14:28** |
| **Transcribed by:** | **SDNY USAO** |
| **Language:** | **English/Spanish** |
| <div>**PARTICIPANTS**</div><div>Kofi O. Amankwaa (KOA)</div><div>USC Child-5</div><div>Victim-5</div><div> </div><div>**NOTATIONS**</div><div>[U/I]   = unintelligible</div><div>[    ]   = Comments contained within brackets are the transcriber's comments.</div> ||

**KOA:** [U/I]. When did you go back?

**USC Child-5:** Last week Monday. Yeah.

**KOA:** Alright so, you have some questions for me?

**USC Child-5:** Yes, we're a bit unsatisfied with the process that's been, umm, I feel like you haven't been completely transparent with us. When the customs officers checked my parent's papers, it came up as the reasoning for their papers, their work permission was under "abused," as if I abused them, when we clearly came and stated that we wanted you to be claimed – well I wanted them to be claimed under my name. So, we just want to ask questions. What process is this? Why didn't you ask us first to see if that way can be, um, is like valid or um, yeah – we're just a bit frustrated, upset, and, um, we just want clarity.

**KOA:** Okay. [U/I] You come in with a specific inquiry.

**USC Child-5:** Yes.

**Victim-5:** Necesito las copias.

[UNOFFICIAL TRANSLATION: *I need the copies*.]

**KOA:** Which is you came to this country without permission.

**USC Child-5:** Mhm.

**KOA:** Is there any way we can take you from without permission to you being a resident [U/I]. The biggest problem is the government says if you enter without inspection, I'm not even going to talk to you.

**USC Child-5:** Mhm.

**KOA:** You are an American citizen over 21 years. The law allows you to ask for your parents. And you want to do that.

**USC Child-5:** Mhm.

**KOA:** You want to do that as soon as you turn 21. But, when you ask, the government will say – What's your name. Your name?

**USC Child-5:** [USC Child-5 first name].

**KOA:** [USC Child-5 first name], the government will say, [USC-Child-5 first name], I don't have any problem with you. You are an American citizen. Make your petition. But, you put your petition in, before you even drop the petition…

**USC Child-5:** Mhm.

**KOA:** …the government says, ah, look at this, the next step is, tell mom and dad to make their application. Their part is called application. Now, they want to start to do the application, and the first question, of course, they ask you your name. They ask you where you were born, they ask you, when you entered this country, and they ask you how did you enter? And their answer is, um, oh, did anyone give you permission to enter? We know the answer.

1

**USC Child-5:** Mhm.

**KOA:** The answer is no. Nobody gave you permission. As soon as you say that, then the government says, I'm not going to talk to you, because they entered this country illegally. It wasn't lawful.

**USC Child-5:** Mhm.

**KOA:** Ok, so I'm not even going to entertain the application for them. [U/I] So the conversation stops.

**USC Child-5:** Mhm.

**KOA:** They're stuck where they are. And they will be stuck forever and ever until someone finds a remedy for that situation. Is there a remedy for that situation? Yes. What's the remedy for that situation? The remedy for that situation is called "abuse petition." Abuse petition waives everything, the illegal entry, forgives that. Forgives them for entering this country. That's the only way that you can get….

**Victim-5:** Que te dijo?

[UNOFFICIAL TRANSLATION: *What did he tell you?*]

**USC-Child-5:** Let me just translate.

**KOA:** Yeah, yeah, please.

**Victim-5:** Que te dijo?

[UNOFFICIAL TRANLSATION: *What did he tell you?*]

**USC Child-5:** Que, apartir de veintiuno anos, yo un hijo ciudadano, puedo pedir hacer la peticion al gobierno por los papas la peticion va ser aceptada el gobierno despues va pedir sus nombres, toda su informacion, y como entraron a los estados. El momento que les diga que entramos ilegalmente, el gobierno ya no va querer hacer nada con la peticion, que lo va ignorar. El dice que hay un remedio, el unico remedio es que si asemos la peticion del abuso, cuando la peticion del abuso se mete el gobierno ignora la razon porque entraron ilegalmente y automaticamente aceptan su aplicacion. Hasta alli es donde llegamos.

[UNOFFICIAL TRANLSATION: *That, from the age of 21, I, being a citizen, can ask to make a petition to the government for the parents. The request will be accepted, the government will then ask for your names, all your information, and how you entered the states. The moment I tell them that you entered illegally, the government will no longer want to do anything with the request, they will ignore it. He says that there is a remedy, the only remedy is that if we file the abuse petition, when the abuse petition is filed, the government ignores the reason why they entered illegally and automatically accepts their application. That's where we got up to.*]

**Victim-5:** No pero dile que porque el no nos explico eso, al principio? Porque el no nos dijo que hiba a aplicar eso? Por eso es la razon que yo tube problemas cuando yo llegue! Porque el nunca dio esa informacion ni con nosotros ni con los demas que estan alla. Porque el tiene que explicar eso y ya eso es opcional de que uno lo acepta o no lo acepta porque eso es su deber como

USAO_00000004

avogado de informarnos. Pero el en ningun momento no nos dijo eso, asi que yo necesito que me de as copias de mis aplicaciones porfavor para que yo lo podre ir bien.

[UNOFFICIAL TRANSLATION: *No, but tell him why didn't he explain that to us at the beginning? Why didn't he tell us that he was going to apply that? That's why I had problems when I arrived! Because he never gave that information to us or to the others who are out there. Because he has to explain that and that is optional whether one accepts it or not because that is his duty as a lawyer to inform us. But he never told us that, so I need him to give me copies of my applications please so that I can do it.*]

**KOA:** So, it's a problem that you've been doing your utmost…

**USC Child-5:** Mhm.

**KOA:** …to try to fix. There is going to be a fix.

**Victim-5:** Porque haces mentira? Tu no estas haciendo violencia, yo no voy a aceptar eso.

[UNOFFICIAL TRANSLATION: *Why are you lying? You are not doing violence; I am not going to accept that.*]

**USC Child-5:** So, um, what upsets us is you weren't transparent from the beginning. You didn't tell us the abuse petition. If you would've given that as an option from the start. We came under the impression that it was going to be done differently. Um, and you never stated from the beginning that it was going to be through the abuse petition. Um, so, we would've taken that into consideration.

**KOA:** You are not getting your green card through the abuse petition. We just use that to clean them up for further steps to get your green card.

**USC Child-5:** How does that affect me?

**KOA:** Not at all.

**Victim-5:** Que dice?

[UNOFFICIAL TRANLSATION: *What did he say*?]

**USC Child-5:** Que-

[UNOFFICIAL TRANLSATION: *That*-]

**KOA:** This is the first petition.

**USC Child-5:** Mhm.

**KOA:** This is what we need from this first petition. Soon as we get this, they travel, then back, we put in, no, it goes through inspection at the airport, it's – they're cleared up. I know.

**Victim-5:** Aqui nos consta que si van a limpiar ese record. Si el no empeso con decir nos la verdad.

[UNOFFICIAL TRANSLATION: *Here we need to know if they are going to clean up that record. If he didn't start by telling us the truth*.]

USAO_00000005

**USC Child-5:** What is the guarantee that it's going to be cleared?

**KOA:** [U/I] Soon as they come back like this and we do the green card application, we withdraw it, and they give us a letter that that case is withdrawn, it's clear, it doesn't exist anymore.

**USC Child-5:** Dice que, al momento que ya regresen y que pongomos la aplicacion para el green card que la peticion del abuso va ser reclamado departe del osea que ya no va seguir adelante como si nunca existio y va seguir adelante el green card porque ya el gobierno fue el que aprovo eso.

[UNOFFICIAL TRANSLATION: *He says that the moment you return and we put in the application for the green card, the request for abuse will be recalled by him, meaning that it will no longer continue as if it never existed and the green card will continue because the government was already the one who approved that*.]

**Victim-5:** Que me de la aplicacion y que me de tiempo, que yo lo voy a pensar y que nomas me de la copia y ya mas adelante vemos.

[UNOFFICIAL TRANSLATION: *Give me the application and give me time, I'm going to think about it and just give me the copy and we'll see later*.]

**USC Child-5:** So, she wants time to think about it.

**KOA:** Okay.

**Victim-5:** Lo voy a pensar.

[UNOFFICIAL TRANSLATION: *I'm going to think about it*.]

**USC Child-5:** Um, but she wants to request a copy of our case. She wants to think about it, but she also wants a copy of –

**KOA:** Give me something with your names on it and I'll have someone fish out the files for them.

**USC Child-5:** Tu ID con tu nombre. Los dos.

[UNOFFICIAL TRANSLATION: *Your ID with your name. Both of you*.]

**Victim-5:** El ID? Tienes el ID alli?

[UNOFFICIAL TRANSLATION: *The ID? You have the ID there?*]

**USC Child-5:** Algo con su nombre.

[UNOFFICIAL TRANSLATION: *Something with your name*.]

**Victim-5:** Tienes el ID?

[UNOFFICIAL TRANSLATION: *You have the ID?*]

**USC Child-5:** For both of them?

**KOA:** Mhm.

USAO_00000006

**Victim-5:** Tengo el de Nueva York. Ehh- Esta. Esta? Esta? [U/I] Mira dale el de Nueva York. [U/I]

[UNOFFICIAL TRANSLATION: *I have the New York one. Thi- This one. This one? This one? [U/I] Look give him the New York one. [U/I].*]

**KOA:** There are no other names with your name? It's just…

**USC Child-5:** Yeah, for her it's just [Victim-5 Name], yeah.

**KOA:** Just the two names.

**Victim-5:** No no es dos nombres. Nomas un nombre.

[UNOFFICIAL TRANSLATION: *No it's not two names. Just one.*]

**USC Child-5:** No? Si es nombre, apellido.

[UNOFFICIAL TRANSLATION: *No? It is the first name and last name.*]

**Victim-5:** Aja, [Victim-5 Name].

[UNOFFICIAL TRANSLATION: *Yes, [Victim-5 Name].*]

**USC Child-5:** Si, exacto.

[UNOFFICIAL TRANSLATION: *Yes, exactly.*]

**Victim-5:** [U/I] Nomas te dije para no sacar mmm- mi licencia [U/I]

[UNOFFICIAL TRANSLATION: *I just told you so as not to get mmm- my license [U/I].*]

**KOA:** Do you remember who did your papers?

**Victim-5:** Que dice?

[UNOFFICIAL TRANSLATION: *What did he say?*]

**USC Child-5:** Who did our papers?

**KOA:** Yes, I mean. The person that handles.

**USC Child-5:** We came directly to you. We came directly to you.

**KOA:** I know, I don't make the papers.

**Victim-5:** Cual?

[UNOFFICIAL TRANSLATION: *Who?*]

**USC Child-5:** Quien de la oficina fue el que hizo nuestros papeles?

[UNOFFICIAL TRANSLATION: *Who from the office made our papers?*]

**Victim-5:** El senor que esta aqui en entrada en primer- en primer mesa.

[UNOFFICIAL TRANSLATION: *The man who is here at the entrance at- at the first desk.*]

USAO_00000007

**USC Child-5:** The guy here in the middle…

**Victim-5:** En la primer mesa

[UNOFFICIAL TRANSLATION: *At the first desk*.]

**USC Child-5:** … um, in the middle room, the guy to the right by the door.

**KOA:** Kujo

**USC Child-5:** Yeah.

**KOA:** Kujo.

**Victim-5:** El fue el que saco las copias.

[UNOFFICIAL TRANSLATION: *He is the one who made the copies*.]

**USC Child-5:** He's the one that took all the copies for all the documents.

**Victim-5:** Y las aplicaciones.

[UNOFFICIAL TRANSLATION: *And the applications*.]

**USC Child-5:** And the applications.

**Victim-5:** Que nomas me de la aplicacion. La copia y que despues yo le alcanso. [U/I]

[UNOFFICIAL TRANSLATION: *Just give me the application. The copy and then I'll catch up with him*.]

**KOA:** [U/I]

**USC Child-5:** [Phone number redacted].

**KOA:** Ok.

**Victim-5:** Que si me puede dar las copias a la otra.

[UNOFFICIAL TRANSLATION: *Can he give me the copies next time?*]

**KOA:** [U/I]

**USC Child-5:** Okay.

**KOA:** [U/I]

**Victim 5:** Pero no me lo puede dar hoy?

[UNOFFICIAL TRANSLATION: *But he can't give it to me today?*]

**USC Child-5:** Say it again?

**KOA:** I said that on Mondays, every Monday…

**USC Child-5:** Uh huh.

**KOA:** …there's too much that goes on.

6

USAO_00000008

**USC Child-5:** Okay.

**KOA:** So, I'm going to give it to someone to get it ready.

**USC Child-5:** Okay.

**Victim-5:** Y el no lo puede hacer hoy?

[UNOFFICIAL TRANSLATION: *And he can't do it today?*]

**USC Child-5:** El no lo va hacer, hay otros muchachos que trabajan que sacan las copias.

[UNOFFICIAL TRANSLATION: *He is not going to do it, there are other guys that work who make the copies*.]

**KOA:** As soon as it's ready we will call you to come pick it up.

**USC Child-5:** Okay. Que la proxima vez que vengamos- regresemos que no sea un lunes que los lunes son los dias, mas ocupados aqui. Hay mucha gente.

[UNOFFICIAL TRANSLATION: *Okay. Next time we come here, it can't be a Monday, as Mondays are the busiest days here. Many people*.]

**Victim-5:** Entonces otra dia.

[UNOFFICIAL TRANSLATION: *So another day*.]

**USC Child-5:** Otra dia el se lo va dar a alguien para que saque copias de todo de nuestro caso y que, con mi numero, nos van a llamar para recojerlo y despues ya no hay que esperar. Okay.

[UNOFFICIAL TRANSLATION: *Another day. He will give it to someone to make copies of everything in our case and, with my number, they will call us to pick it up and then there will be no more waiting. Okay*.]

**KOA:** Okay

**USC Child-5:** Yeah. Thank you, Kofi.

USAO_00000009