P2qFamaS

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          24 Cr. 549 (KPF)

5    KOFI AMANKWAA,

6                                          Sentence
                        Defendant.
7    ------------------------------x

8
                                          New York, N.Y.
9                                          February 26, 2025
                                          3:00 p.m.
10

11   Before:

12                  HON. KATHERINE POLK FAILLA,

13                                          District Judge

14                        APPEARANCES

15   MATTHEW PODOLSKY
          United States Attorney for the
16        Southern District of New York
     BY:  ADAM MARGULIES
17        Assistant United States Attorney

18   TODD SPODEK
          Attorney for Defendant
19

20   Also Present:

21
     Elizabeth Iliakostas, Interpreter (Spanish)
22   Elizabeth Caruso, Interpreter (Spanish)
     George Johnson, Special Agent, Homeland Security Investigations
23

24

25

P2qFamaS

1          (Case called)

2          MR. MARGULIES:  Good afternoon, your Honor.

3          Adam Margulies for the government.  I'm joined by HSI

4   Special Agent George Johnson and an intern in our office, Keith

5   Carpenter.

6          THE COURT:  Good afternoon to each of you, and thank

7   you very much.

8          Mr. Spodek, welcome back.

9          MR. SPODEK:  Good afternoon, your Honor.

10         Todd Spodek, and with me is Mr. Kofi Amankwaa at the

11  defense table.

12         Thank you.

13         THE COURT:  Thank you very much.

14         Just before you sit down, Mr. Spodek, are there any

15  members of Mr. Amankwaa's family or friends that are here that

16  I should know about?

17         MR. SPODEK:  Yes, Judge.

18         There are members of Mr. Amankwaa's family.  They are

19  sitting in the second row, so I could just introduce you,

20  briefly.  First from right is his adopted son, Charles.  Next

21  to Charles is Afriyie, his daughter.  Next to Afriyie is a

22  close friend, Victor, and last but not least, to his left is

23  his daughter, Serwaa, and in the row behind is his wife,

24  Beatrice.

25         THE COURT:  Thank you very much for introducing me.

1    I'll ask you, sir, if you could give those names to

2 our court reporter at the end of this proceeding.

3    MR. SPODEK:  Yes, of course, your Honor.

4    THE COURT:  Thank you.

5    And I also know that there are individuals who are

6 here as members of public and there are individuals who are

7 here as victims who want to be heard this afternoon.

8    What I propose to do and what I've done in other cases

9 is that, I do have some questions of the parties, first of all,

10 to make sure I've complied with the Rules 32 dictates and also

11 to clarify some things for myself.  Then I'd ask for the

12 government's main sentencing presentation.

13    Then I'd ask, please -- I have Four names with names

14 on them, and if it's okay with the parties, I'm just going to

15 call them in the order that I have the pages.  And to the

16 extent someone needs the assistance of an interpreter, I will

17 ask the interpreter to please come forward to assist, because

18 what I'd like to do is hear the victims with the government's

19 presentation and then hear the defense presentation with

20 Mr. Spodek and Mr. Amankwaa.

21    Is there any objection to that protocol?

22    MR. MARGULIES:  No, your Honor.

23    MR. SPODEK:  No, your Honor.

24    THE COURT:  Great.  Thank you.

25    Let me also make sure that I have the documents I

1  should have.  I have a presentence investigation report that is

2  dated December 10th of 2024.  I have a defendant's amended

3  sentencing submission that is dated February 18th of 2025.

4  There are exhibits that include letters from supporters and

5  family members, and as well, medical records.  I have a

6  government sentencing submission is that is dated February 19th

7  of 2025.  I have victim impact statements that were received by

8  me on February 19th and February 24, 2025.  I have a consent

9  preliminary order of forfeiture that was signed in September of

10  2024.  And I've been advised that the parties may be seeking an

11  adjournment to do an order of restitution.

12           Mr. Margulies, should I have anything else from the

13  government, sir?

14           MR. MARGULIES:  No, your Honor.

15           THE COURT:  Mr. Spodek, should I have anything else

16  from the defense?

17           MR. SPODEK:  No, your Honor.

18           Thank you.

19           THE COURT:  Mr. Margulies, a few questions for you,

20  please, sir.

21           Has the government had a sufficient opportunity, under

22  Federal Rule of Criminal Procedure 32, to review the

23  presentence investigation report in this case?

24           MR. MARGULIES:  Yes, your Honor.

25           THE COURT:  Do you have any objections to its

P2qFamaS

1    contents?

2              MR. MARGULIES:  No, your Honor.

3              THE COURT:  Do I understand correctly that the

4    proposed forfeiture figure is $3,389,000 and the proposed

5    restitution figure, the one I was given was $16,503,425.

6              But do you expect that number to change, or do you

7    need the time to figure out where the money is going?

8              MR. MARGULIES:  It's principally to figure out where

9    the money is going, your Honor.

10             THE COURT:  Do you not want me to impose a restitution

11   number today?

12             MR. MARGULIES:  That's correct.

13             We want to keep it open, your Honor, to determine,

14   principally, who will be on the restitution schedule and what

15   amounts will be apportioned to the various victims.

16             THE COURT:  Please bring yourself a little bit closer

17   to the microphone.  You are a tall man, and this is a bad

18   courtroom for acoustics.

19             Mr. Margulies, may I understand, please, the

20   difference between the forfeiture figure and the restitution

21   figure?

22             MR. MARGULIES:  Yes, your Honor.

23             So, the forfeiture figure is based on the legal fees

24   that were paid to Mr. Amankwaa or his law office.  In other

25   words, the ill-gotten gains of the fraud.  The restitution

P2qFamaS

 1    figure is a little bit larger than that because it accounts for

 2    the victims' losses as a result of the fraud, regardless of

 3    whether those losses were paid directly to Mr. Amankwaa.

 4         So, for example, they consider things like a medical

 5    fee that was paid to a different individual, not Mr. Amankwaa,

 6    but as a result of Mr. Amankwaa's fraudulent conduct.  It also

 7    included a USCIS filing fee, which was also paid, again, to

 8    USCIS, not Mr. Amankwaa.  So that's the difference, your Honor.

 9         THE COURT:  Thank you.

10         Let me just see whether I have other questions for

11    you, sir.  No.  I might ask you some things in connection with

12    your presentation.

13         Thank you.

14         Mr. Spodek, sir, a few questions for you, sir.

15         MR. SPODEK:  Yes, your Honor.

16         THE COURT:  Have you and has Mr. Amankwaa each had an

17    opportunity to review the presentence investigation report in

18    this case?

19         MR. SPODEK:  Yes, Judge.

20         We have reviewed it at length, line by line, including

21    yesterday.

22         And I do have two minor corrections that I advised the

23    government in advanced that were overlooked.

24         THE COURT:  Yes, sir.

25         MR. SPODEK:  The first is under his education.  It

P2qFamaS

1    says bachelor's degree, but in reality, he basically has the

2    equivalent of a juris doctorate from Ghana.

3            They call it an LLB.

4            THE COURT:  It's a bachelor of law.

5            I didn't think it was like a bachelor of the arts, but

6    I understand.  I don't think we need to make that change, but

7    I -- if it looks confusing, I will.

8            Thank you.

9            MR. SPODEK:  Certainly, your Honor.

10           And the second item is under the value for the home.

11           THE COURT:  Yes.  I was wondering about the $7 million

12   home in South River.

13           MR. SPODEK:  That is an error that was overlooked.

14   It's a $700,000 estimate.  That's the value we provided to

15   probation.  Somehow it unfortunately became 7 million, but that

16   is an inaccurate number, by all accounts.

17           THE COURT:  In my notes, that is PSR, paragraph 121.

18           MR. SPODEK:  That's correct, Judge.

19           THE COURT:  Okay.  We'll make that change to

20   paragraph 121.

21           Thank you.

22           Other than those changes -- with which I'm sure

23   Mr. Margulies does not disagree -- are there other objections

24   to the presentence investigation report?

25           MR. SPODEK:  No, your Honor.

1    THE COURT:  At the back of the report, sir, as you

2  know, there are mandatory, standard, and special conditions of

3  supervised release.

4    Have you reviewed those with your client?

5    MR. SPODEK:  I have reviewed those, both of those, and

6  I have two remarks regarding those as well, your Honor, just

7  briefly.

8    THE COURT:  Okay.  And now you say two.  I've got

9  four, but let's talk.  I have: access to financial information,

10  a proscription on certain lines of credit or credit charges, an

11  outpatient mental health condition, and a recommendation of

12  supervision in the district of residence.

13    Are those the ones you have as well?

14    MR. SPODEK:  Actually, no, your Honor.

15    I just wanted to bring to your Honor's attention two

16  things, one regarding him being employed full time and what I

17  anticipate will be the difficulty in achieving that.  So as an

18  alternative, I wanted to ask if your Honor would consider

19  volunteer work or something along those lines.  I know

20  probation has the ability to disregard that provision, but to

21  avoid any issues in the future, I wanted to bring it to Your

22  Honor's attention.

23    And then there's a standard condition regarding that

24  he should knowingly -- I'm sorry, that he should not knowingly

25  communicate or interact with a convicted felon, and his son is

1    a codefendant in this case.  We don't know where that case will

2    wind up, but in the event that he is convicted, I would ask

3    that he be permitted to communicate with his son.

4            Other than that, we don't have any objections to them,

5    Judge.

6            THE COURT:  Stay right there.

7            Mr. Margulies, is it acceptable to you if I amend

8    those two standard conditions so that work could include

9    volunteer work?

10           MR. MARGULIES:  Yes, your Honor.

11           THE COURT:  And separately -- and I've done this in

12   other cases -- making an exception to the condition regarding

13   associating with known felons to exclude members of the family?

14           MR. MARGULIES:  Yes, your Honor.

15           THE COURT:  Okay.  Thank you.

16           Mr. Spodek, though, a question for you, please.

17           Based on other information in the presentence

18   investigation report, I thought it might be useful to have a

19   drug or alcohol testing or treatment condition in here.  It

20   gets triggered by need.  It's not necessarily a matter of

21   course, but given your request that your client participate in

22   the RDAP program, I thought it might be useful.

23           May I include that as well?

24           MR. SPODEK:  Absolutely.

25           We have no objection to that.  He's working hard on

1  his sobriety, and we are in agreement.

2          THE COURT:  Okay.  Now, sir, we've just talked about

3  these conditions, and I'll discuss them briefly with your

4  client.  Is it acceptable to you if I refer to these

5  conditions, in the aggregate, as the mandatory, standard, and

6  special conditions and not read them word for word into the

7  record?

8          MR. SPODEK:  Yes.  Of course, your Honor.

9          THE COURT:  Thank you.

10          May I address these issues to Mr. Amankwaa?

11          MR. SPODEK:  Yes, of course.

12          THE COURT:  Thank you.

13          Mr. Amankwaa, you're welcome to remain seated, sir,

14  and I'll just ask you to bring the microphone closer to you

15  because I do want to be sure I hear you.

16          Sir, your attorney has advised me that you and he have

17  reviewed the presentence investigation report in this case; is

18  that correct?

19          THE DEFENDANT:  That's correct, your Honor.

20          THE COURT:  He advises me that other than two factual

21  changes to statements about you in the report, you have no

22  objection to its contents; is that correct?

23          THE DEFENDANT:  Yes, your Honor.

24          THE COURT:  He advises me that you have reviewed the

25  mandatory, standard, and special conditions of supervised

P2qFamaS

1    release and that you don't object to those conditions, with two

2    modifications that you heard me discuss with him; is that

3    correct?

4                  THE DEFENDANT:  That's correct, your Honor.

5                  THE COURT:  And with respect to the special

6    conditions, they would include the provision of access to

7    financial information to your supervising probation officer, a

8    restriction on lines of credit or credit charges unless you're

9    in compliance with your restitution payments, an outpatient

10   mental health treatment condition as need be, a drug and

11   alcohol testing and treatment condition if need be, and a

12   request for a recommendation that you be supervised in your

13   district of residence if that doesn't happen to be this

14   district.

15                  Are those acceptable to you, sir?

16                  THE DEFENDANT:  Yes, your Honor.

17                  THE COURT:  And is acceptable to you if I refer to

18   those conditions as a group without reading them word for word

19   into the record?

20                  THE DEFENDANT:  Yes, your Honor.

21                  THE COURT:  Thank you.

22                  With the modifications we've been discussing, I'm

23   adopting the Mr. Guerrero, the guidelines calculations

24   contained in it and the factual statements contained in it,

25   just a few more questions Mr. Spodek.  Before I.

P2qFamaS

1          MR. SPODEK:  Yes, of course.

2          THE COURT:  Before I hear the parties' sentencing

3   submissions, in paragraph 124 -- and you don't have to turn to

4   it unless you want to -- there's a reference to your client

5   being asked to provide tax filings so that the probation office

6   can determine whether a fine was warranted or whether there

7   were other financial issues or conditions that might be

8   appropriate.

9          As of the time that I received this report, that

10  information had not been produced.  Did you later provide the

11  tax information to the probation office?

12          MR. SPODEK:  No, Judge.

13          We have not provided tax documents to probation.

14          THE COURT:  Did your client file tax documents for

15  those four years, sir?

16          MR. SPODEK:  One moment Judge.

17          (Counsel conferred with the defendant)

18          THE COURT:  And, obviously, sir, if there's a reason I

19  should not know this, you will not tell me.

20          MR. SPODEK:  Your Honor, as of today --

21          THE COURT:  One moment, Mr. Spodek.

22          MR. SPODEK:  I apologize.

23          THE COURT:  Just one thing I'd like to place on the

24  record.  It's something that our court reporter is noticing.

25  There are folks who are listening in on these proceedings, and

1  they are welcome to do so and invited to do so.  It was our

2  hope, number one, that they would be muted, and number two,

3  that they wouldn't be speaking.  That has not been entirely the

4  case.  And though you and I cannot hear them, our intrepid

5  court reporter can, so I'm asking the folks who are listening

6  in on this conference to, please, either mute yourselves or

7  refrain from speaking so that you're not interrupting these

8  proceedings and that our court reporter can take them down.

9          I thank you in advance.

10          Mr. Spodek, sir, you were about to tell me.

11          MR. SPODEK:  Yes, your Honor.

12          As of today, those filings have not been made all

13  together, so the past four year of tax returns have not been

14  failed and thus, have not been produced.

15          THE COURT:  Okay.  I see.

16          Sir, separate question, and this one I might need you

17  to look at the report.  For me, beginning at page -- really,

18  page 23, there is a list of liens, tax liens and other

19  judgments that -- my math skills are suspect, but they're well

20  in excess of $400,000.

21          What are they?  What plans are there to pay them off,

22  and how is that going to work with the restitution schedule?

23          MR. SPODEK:  Judge, if I could have one moment.

24          (Counsel conferred with the defendant)

25          THE COURT:  Yes, of course.

P2qFamaS

1          And Mr. Margulies, I should have asked you that, sir,

2     if you had a thought on this.  I think tax liens may take

3     primacy over certain things.

4          MR. MARGULIES:  I'm not sure off the top of my head,

5     your Honor.

6          THE COURT:  Okay.

7          MR. MARGULIES:  But I will look into it.

8          THE COURT:  But you saw this.  Yes?

9          MR. MARGULIES:  Yes, your Honor.

10         THE COURT:  Okay.  Thank you.

11         MR. SPODEK:  Your Honor, we had reviewed the liens

12    prior to today, and unfortunately, Mr. Amankwaa wants to make

13    it right and wants to pay back all these judgments that he

14    owes, but he has been unable to and has not made payments

15    towards them.

16         THE COURT:  Some of -- a lot of these are tax liens,

17    sir, which suggests your client wasn't paying taxes or at least

18    wasn't paying them properly for a long period of time.

19         Am I allowed to know what this other stuff is?  Are

20    these clients with who he's had disputes?  One looks like,

21    perhaps, a mortgage servicer?  I didn't know.

22         MR. SPODEK:  Sure, let me just confirm.

23         THE COURT:  Yes, sir.

24         (Counsel conferred with the defendant)

25         MR. SPODEK:  Your Honor, to the best of my client's

P2qFamaS

1    recollection, the majority of these are tax liens, and then

2    some of them are employee or vendor from the law firm practice.

3                 THE COURT:  Okay.  Thank you.

4                 Another question for you, sir, in the vein of

5    housekeeping, and this actually sort of dovetails with the

6    clarification about the home value.

7                 According to the government, the amount of legal fees

8    that your client received was somewhat north of $13 million,

9    but in the presentence investigation report at paragraph 116,

10   it says that your client made 40 to $80,000 per year.  That's

11   nowhere near 13 million.

12                Where did the money go?

13                MR. SPODEK:  So, Judge, just to clarify --

14                THE COURT:  Yes.

15                MR. SPODEK:  I believe that first, he was talking

16   about when he first started his business he was making 40 to

17   $80,000 a year.  I don't think that was for the duration of his

18   law practice, including the years that are part of this

19   particular case, which is 2016 to 2023.

20                THE COURT:  I see.  Because you'll see that that

21   sentence is prefaced with the clause, he added that over time.

22   But then I see the next sentence, which is where he declined to

23   discuss his employment further.  So, you're not disputing that

24   his firm earned 13 -- almost $13.4 million during this

25   seven-year period.

1          MR. SPODEK:  Correct, Judge.

2          THE COURT:  Okay.

3          MR. SPODEK:  We are not disputing that and have agreed

4     to forfeiture in that amount.

5          THE COURT:  Okay, thank you.

6          Those were the housekeeping questions.  I thank you

7     very much.

8          Mr. Margulies, I would welcome your thoughts right now

9     with respect to sentencing.  You know and Mr. Spodek knows that

10    I have reviewed the sentencing submissions.  I've reviewed all

11    of the attachments.  I've reviewed all of the victim impact

12    statements.

13         You can tell me anything you want.  I'd ask you just

14    not to say, we rely on our written submissions, but to the

15    extent that there's any evidence that Mr. Amankwaa targeted the

16    Mexican community in his neighborhood, as distinguished from

17    there being just word of mouth growth, I would be interested.

18         Because one of the things that you're saying to me is

19    that he was able to exploit his clients' lack of facility to

20    the lack of the English language in addition to their lack of

21    facility with legal terminology.  So if that was by design, as

22    distinguished from by happenstance, I'd be interested in

23    knowing that, and then anything else you want me to know.

24         MR. MARGULIES:  Thank you, your Honor.

25         And may I use the podium?

P2qFamaS

1          THE COURT:  Yes, of course.

2          MR. MARGULIES:  So lee me just respond, first,

3    directly to your Honor's question.  The government's view,

4    based on its investigation, is not that he specifically

5    targeted a nationality.  It's more what your Honor said, was

6    that these were the clients that he started representing in

7    connection with these VAWA applications, and as time went on,

8    word of mouth spread and then he accumulated more and more

9    clients of Mexican nationality.

10          It's not necessarily the case that each and every

11   single one of the few thousand clients that he filed VAWA

12   applications on behalf of were Mexican nationals, but the vast

13   majority of them were.

14          And while the government's view is, certainly, that he

15   targeted -- well, that he filed applications on behalf of a

16   very vulnerable population knowing of their various

17   vulnerabilities, it's not that he did so because of their

18   nationality.

19          Now, I do want to step back for a moment and just talk

20   a little bit about the conduct here.

21          From September 16 through November 2023, Mr. Amankwaa

22   orchestrated a scheme to submit fraudulent applications under

23   the Violence Against Women Act, or VAWA, falsely alleging that

24   that his clients were the victims of abuse by their children or

25   another close family member.

1    Mr. Amankwaa used the filing of the false applications

2    to get advance parole travel authorizations.  He directed his

3    clients, then, to travel abroad and return, and he would use

4    the advance parole that they got as a part of that process as a

5    basis to apply for lawful permanent resident status.

6    Now, this was not a one-time mistake.

7    THE COURT:  Would you agree as well, sir, it wasn't a

8    loophole in the legal system?

9    MR. MARGULIES:  I would, your Honor.

10    THE COURT:  Okay.

11    MR. MARGULIES:  It was not a loophole.  It was not a

12    one-time mistake.  It was not a lapse of judgment or something

13    that can be explained, or at least adequately explained by

14    alcohol or anything else.

15    Whatever the motivation behind this at the very

16    beginning was, what it became was a deliberate and complex

17    scheme that he led for years.

18    And it continued even after a high-profile family

19    separation that was reported publically on and around April 20,

20    2023.

21    And there's no indication that it would have stopped,

22    but for the suspension of Mr. Amankwaa's law license in around

23    November 2023.

24    Now, while immigration fraud is always a serious

25    crime, there are many aspects of Mr. Amankwaa's conduct here

1   that make it particularly serious.

2          As reflected in the victim impact statements, your

3   Honor, and in the recording that the government attached to its

4   submission and some of the examples in the PSR, Mr. Amankwaa

5   largely did this without looping his clients into exactly what

6   he was doing.

7          Certainly, at the start of the process when he filed

8   the applications, he generally did not tell them how he was

9   getting lawful permanent resident status on their behalf.

10         And he didn't tell them, despite the fact that the

11  mechanism he was using was so deeply personal.  This was not

12  Mr. Amankwaa filing an asylum application saying that a client

13  was being abused by a foreign country or by a cartel in a

14  foreign country.  It was an application saying that they were

15  abused by the people who were closest to them, by their

16  children and by other loved ones.

17         He also took advantage of a law that was designed to

18  help those people.  He enlisted others to assist him in

19  carrying out the scheme.  He abused his law degree and his

20  position of trust to carry out the scheme, and as I mentioned

21  earlier, your Honor, he did take advantage of a vulnerable

22  population, people who largely did not speak English and people

23  who did not have the funds to pay for these types of services

24  without making significant changes in their life to save up for

25  his services.

P2qFamaS

1    Now, when thinking about the 3553(a) factors here, I

2  think the one that first comes to mind is the need for the

3  sentence to reflect the seriousness of the crime, to promote

4  respect for the law, and to provide just punishment for the

5  offense.  And I think sometimes, your Honor, when we think

6  about those factors, sometimes we just boil it down into one of

7  those clauses.  We talk about the seriousness of the offense or

8  we talk about just punishment, but here, I think, in this

9  particular case, each of those clauses in that 3553(a) factor

10  takes on very meaningful significance.

11    The conduct in this case was extremely serious for the

12  reasons I just said.  And with respect to the need to promote

13  respect for the law, Mr. Amankwaa's conduct was very damaging,

14  not just to VAWA, but to the immigration laws as a whole.

15    And the fact that he did this as an immigration lawyer

16  also calls out for the need for the sentence to promote respect

17  for the law.

18    And as for just punishment, your Honor, here, I'm

19  thinking in particular about the victims in this case.

20  Obviously, the government was a direct victim of Mr. Amankwaa's

21  conduct because that's who he made false statements to, the

22  government.  And the government obviously had to expend

23  resources to investigate his conduct.  They had to, you know,

24  ultimately, very closely watch the applications of the people

25  who he applied for VAWA relief on behalf of.

1          But beyond the government I'm thinking here about his

2     clients and former clients.  As I said earlier, these are

3     clients who really had to save up money and turn their whole

4     lives upside down to pay for these services, and they didn't

5     even know what they were paying for.  They got their hopes up.

6     I think many of them, for the first time in years or decades,

7     believed that this was their opportunity to finally adjust

8     their status, and ultimately, your Honor, those hopes, in the

9     vast majority of situations, were dashed.

10          And it bears noting that Mr. Amankwaa as an immigrant

11     himself who came from very little should have already known

12     this.  He should have known what it took to save up money.  He

13     should have known the hope that one feels when they are going

14     through the immigration process, and he carried out the scheme

15     anyway.

16          Your Honor, with respect to deterrence, while the

17     government is not focused on specific deterrence here, this is

18     a case that really does call out for general deterrence.

19     Immigration fraud is a major problem.  It's a problem that I

20     think is often hard to detect, in part because clients of

21     lawyers who commit immigration fraud are afraid to come forward

22     both because of their own immigration status and, at times,

23     because of potential criminal exposure.

24          So it's really a case that calls for a message to be

25     sent that this type of conduct will not be tolerated and that

1    any other attorneys who consider engaging in this type of

2    conduct, because they think they'll get away with it,

3    shouldn't.

4         Now with respect to Mr. Amankwaa's history and

5    characteristics, the defense submission and the character

6    letters that were submitted speak, you know, very glowingly of

7    Mr. Amankwaa's role in his community, his generosity with his

8    family members, and things of that nature.  And that's, of

9    course, to be commended.

10        I know we were talking about this a little bit

11   earlier, your Honor, and we don't have a fully-satisfying

12   answer of what Mr. Amankwaa did with all of the money -- much

13   of the legal fees were paid in cash -- but, it seems, from what

14   investigation we've been able to do -- and I think this is

15   consistent with the letters that were submitted in this case --

16   that there's a fair inference that a lot of the money that he

17   was bringing in, he sent to other people, including people back

18   in his community in Ghana.

19        And again, while it's great that he was able to help

20   out other people, what's not great is that he did that with --

21   he took the funds from one community and he, basically, paid it

22   to another community.

23        Look, the government recognizes Mr. Amankwaa's age.

24   We recognize his health issues.  We recognize, certainly, the

25   fact that he has accepted responsibility here in a

1   pre-indictment posture and agreed to a substantial forfeiture

2   and restitution obligation, one that we very much hope he will

3   take seriously -- and I think, but for all of those factors the

4   government might be seeking an even higher sentence -- but in

5   light of his sense of responsibility and in light of the other

6   mitigating factors I just mentioned, we think that, on balance,

7   a guidelines range is appropriate here.

8           So we request that your Honor imposes a sentence

9   within the guidelines range of 70 to 87 months.  We request

10  that the Court orally order forfeiture in the amount of

11  $13,389,000, and that the mandatory, standard, and special

12  conditions be imposed for the reasons stated in the PSR, your

13  Honor.

14          THE COURT:  Is your expectation, sir, that it will

15  take the 90 days to figure out the restitution issue,s, that I,

16  for example, should not hold off on issuing the judgment?

17          MR. MARGULIES:  I think we would like to take as much

18  time as we can just because there are still victims that are

19  coming forward, so we would request for the 90 days or

20  something close to it.

21          THE COURT:  You have 90 under the statute, so I'm not

22  going to tell you no.  I will say this -- and I'm saying this

23  to you and Mr. Spodek -- it's not my intention to set an

24  internal tracker for day 90, so I'm expecting you all to do

25  what you have to do.  And if, perchance, you need additional

1    time beyond the statute, I can you get it, but you have to ask

2    me for it, and I have to know about it.  I don't want to be in

3    a situation where this restitution order never gets entered.

4              MR. MARGULIES:  Absolutely, your Honor.

5              THE COURT:  Let me please ask you this, sir.

6              You've suggested that there's pre-indictment

7    acceptance of responsibility, including the hopeful efforts to

8    make the victims of this case whole.  You would agree with me

9    though, would you not, that every day Mr. Amankwaa's in prison

10   is a day he's probably not earning money he can pay in

11   restitution.

12             Relatedly, I'm not sure what he can do at this stage

13   in his life, without his law license, to earn money to pay

14   restitution.  Maybe the answer is that these are just

15   frustrating things.  I'm trying to -- to the extent that I need

16   to consider the need to provide restitution to the victim --

17   which, in fact, I do need to consider -- I don't know how you

18   want me to consider that in the context of the other 3553(a)

19   factors you're bringing to my attention.

20             MR. MARGULIES:  Certainly, your Honor.

21             So, let me try to address that.  So, I think the first

22   point to be made here is that the reality of this is, it is

23   frustrating, and it is certainly, it is certainly the case that

24   while we hope that Mr. Amankwaa makes every effort to comply

25   with his obligations, and while it is the government's very

1    clear intent to try to enforce those obligations, it may

2    certainly be a situation in which much of the funds simply

3    aren't there.

4         And I think that -- because they've been sent

5    elsewhere already or they are difficult to track down -- and

6    that's something that, you know, I think we needed to be very

7    clear and transparent about in this type of case for the

8    victims and the public.

9         I also think, however, that every dollar that he has

10   that he's able to pay towards restitution will help these

11   individuals, because even little amounts that are paid over

12   time regularly will make a little bit of a difference.

13        Now as far as doing our best to try to enforce those

14   obligations, it may be that Mr. Amankwaa doesn't have much in

15   the way of liquid assets.  And without getting too much into

16   the efforts that the government is prepared to do, there may be

17   other things that the government can try to do to satisfy these

18   obligations.

19        But as between -- in terms of how the Court should

20   think about the restitution obligation here with in relation to

21   Mr. Amankwaa's potential custodial sentence, I'm not sure that,

22   for example, sentencing him to a shorter amount of time would

23   make a material difference here, especially given that his

24   primary means of making money, which was his bar license, has

25   now been taken away, in any event.

P2qFamaS

1    So, it's a frustrating answer, but the government will

2  do what it can to try to get the victims as much payment as

3  possible.

4    THE COURT:  And the defense has not suggested to you

5  that this money is in a place where it can be clawed back and

6  given in forfeiture or restitution.  There's not -- and I'm

7  being a little bit facetious here -- there's not $10 million in

8  his mattress that he can go home and access.

9    MR. MARGULIES:  Not that I'm aware of, your Honor.

10    THE COURT:  Okay.  And it has not been offered to you.

11    MR. MARGULIES:  It has not been offered.

12    THE COURT:  Okay.  Thank you.

13    Other things I should know, sir?

14    MR. MARGULIES:  No, your Honor.

15    THE COURT:  I thank you very much.

16    Let me please understand, am I working with Ms. Olsen

17  Clancy, or someone else?

18    Al right.  The first name that I have is Jael

19  Flores-Rivera.  The microphone is designed for the interpreter,

20  please.  And if I could have -- is it Mr. Flores-Rivera?  Do

21  you need the assistance of the interpreter, sir?

22    MR. FLORES-RIVERA:  NO.

23    THE COURT:  Could I ask you to come to the podium and

24  if you could just speak to me there.

25    Good afternoon to you, and welcome to this courtroom.

P2qFamaS

<div style="margin-left: 2em;">

Sir, let me ask you, did you submit a written letter to me
prior to today?

     MR. FLORES-RIVERA:  No, your Honor.

     THE COURT:  Okay.  Thank you.

     Then I will hear from you now.

     MR. FLORES-RIVERA:  Good afternoon.

     THE COURT:  Good afternoon.

     MR. FLORES-RIVERA:  I just want to thank the
government attorneys for their diligent efforts in trying to
obtain the funds that were illegally obtained from the
defendant's fraudulent scheme and conduct.

     My parents and I are victims of this fraudulent
scheme.  We trusted the defendant's statements and promises.
Both my parents worked hard to obtain the money paid to him,
and it's sad that my parents have to face collateral
consequences as a result of the defendant's actions.

     And I just hope that you can impose a sentence within
the guidelines for him to -- for us, for my family to feel that
there's justice in this case.

     And I just want to say that I trusted -- my parents
trusted him.  We gave all the money that he requested, and
every time we had questions he would always keep us in the
dark.  There was no, never any straight answers from him or his
staff.  Every time we tried to obtain some information
regarding our case, we were always left on hold, never given

</div>

P2qFamaS

any information.  And the lack of transparency that he had with us and as well as all his clients made us frustrated.

And when we came to find out that the government had filed a complaint against him, we were shocked, because, like I said earlier, we believed that he was an upstanding citizen and was accurately relaying the information he was telling us, to the best of his knowledge.

And it hurt us, hurt my family entirely, to the point where my parents are afraid of future consequences that can come from the actions of the defendant, and this is why I ask that your Honor impose a sentence within the guidelines, for my family to feel that justice have been served in this case.

THE COURT:  Are your parents here?

MR. FLORES-RIVERA:  They are not.

THE COURT:  Your parents have authorized you to speak on their behalf.

MR. FLORES-RIVERA:  Correct; they have.

THE COURT:  Are you, sir, a United States citizen?

MR. FLORES-RIVERA:  I am.

THE COURT:  And your parents are not.

MR. FLORES-RIVERA:  Yes.

THE COURT:  And, perhaps, that's why your parents are not here this afternoon?

MR. FLORES-RIVERA:  One hundred percent.

That's accurate.

P2qFamaS

1       THE COURT:  I understand, sir.

2       Thank you very much for letting me know, on behalf of

3  your family, what you experienced.

4       Thank you.

5       MR. FLORES-RIVERA:  Thank you.

6       THE COURT:  The next two on my list are Jimmy Ronnie

7  Ramos and Ana Laura Ramos.  I thought they might be together.

8  Is it all right if they both came up at the same time, and do

9  they need the assistance of an interpreter?

10      Okay.  Thank you.

11      Please come forward.

12      If you each were planning to speak separately, you're

13 welcome to do so.  I thought, though, if you had the same

14 shared experience that you wanted to tell me, you may do as

15 well.

16      MR. RAMOS:  Good afternoon, your Honor.

17      So, I'm here with my sister on behalf of our parents

18 as well, Juventino Ramos Sidoa and Eva Bibiana Bonilla.

19      This whole entire case has affected my family deeply.

20 I remember it really happened when -- because right now me and

21 my sister are college students.  My parents have always wanted

22 to be citizens here.  They've been here for more than 25 years.

23 They've never done anything wrong.  They've always complied

24 with the rules.  I know my dad works every single day, and,

25 it's just -- when we found out, especially with the whole

1    entire case of how they -- Kofi Amankwaa had my sister as an

2    abuser of my parents, which he she cease never done, we love

3    our parents to death.

4              And the fact that this happened -- and for once, my

5    parents thought that they were going to have the opportunity to

6    be able to not live in fear because, yeah, they're not American

7    citizens here, but they act like it.  They've never done

8    anything wrong, and because this was taken away from them,

9    they're just not the same anymore.

10             They live in fear, especially with how things are

11   today, and they really thought that they were going to have

12   something with this, and the fact that this happened --

13             THE COURT:  Yes.  I can imagine.

14             And sir, again is this a situation like the gentlemen

15   who just spoke with me, where you are both U.S. citizens and

16   your parents are not, and so you're speaking with me because

17   you're comfortable being in court and they're not.

18             MR. RAMOS:  Yes, your Honor.

19             THE COURT:  Thank you very much for doing that.

20             And is it Ms. Ana Ramos?  Do you wish to add anything?

21             MS. RAMOS:  Yes.

22             THE COURT:  Please.

23             MS. RAMOS:  If my parents were here, I'm here to

24   represent on behalf of my mom, specifically.

25             THE COURT:  Yes.

1          MS. RAMOS:  Because it was her intention do want to

2    get things going with becoming a citizen, because she had hoped

3    that she would be able to go back to Mexico to see her

4    mother -- so, my grandma -- who is approaching had her late

5    90s.  And, you know, she really wants to go back to be able to

6    see her.

7          And it's really hard for me to be here.

8          THE COURT:  Of course.

9          MS. RAMOS:  There's a lot of pressure as a

10   first-generation American.  I work hard for my parents, and I

11   know they'd be here right now to speak, but due to the

12   political climate of this country, they can't be here.

13         But what Kofi did was something that my mother had

14   difficulty with, living her day-to-day life.  We've developed

15   this codependent relationship where a lot of the decisions

16   they're set to make, they can't make without consulting me or

17   my brother, because we're here.

18         We don't have other family outside from back in

19   Mexico, so we're all we have and we just want to see justice

20   for them, and that's all.

21         THE COURT:  Thank you both very much.

22         I appreciate hearing from you.

23         The next person on my list is Minerva Olmedo.

24         Is Ms. Olmedo here?

25         Ms. Olmedo, would you like the assistance of an

P2qFamaS

1    interpreter?

2              MS. OLMEDO:  Yes.

3              THE COURT:  Madam interpreter, please come forward.

4              Thank you.

5              Ms. Olmedo, my first question is, did you submit

6    something in writing to me, or are you just speaking with me

7    today?

8              MS. OLMEDO:  I did not submit a letter.

9              I'm just going to speak today.

10             THE COURT:  You are welcome to speak.

11             Thank you very much for coming today.

12             MS. OLMEDO:  First of all, I would like to know what's

13   going to happen with us, those people who were deceived and

14   treated in this way, defrauded by him.

15             THE COURT:  When you say, what will happen, do you

16   mean in terms of the money you lost, or in terms of the

17   immigrations consequences of the filings that were made?

18             MS. OLMEDO:  Well, both things, really.

19             THE COURT:  I don't have the ability to speak to the

20   immigration issues.  I'm speaking to the criminal case against

21   Mr. Amankwaa for the fraud that was perpetrated.

22             MS. OLMEDO:  Why did he deceive us like that?  Why did

23   he hurt us like that?

24             We put all our trust in him, all our confidence in

25   him.

P2qFamaS

1           THE COURT:  Let me please say this.  I wanted to

2    answer her prior question, and on the issue of the money that

3    you've lost, the government is asking for me to impose a

4    restitution order so that if money comes in, you will be able

5    to get that money over time.

6           With respect to why he did what he did, I believe he

7    will have an opportunity to say that this afternoon in court.

8           MS. OLMEDO:  Okay.

9           THE COURT:  Is there anything else you'd like me to

10   know about how this affected you?

11          MS. OLMEDO:  We're all in this.  He affected the

12   entire family.  Yes, I am very affected by all of this.

13          THE COURT:  Was it you or multiple people in your

14   family who used his services?

15          MS. OLMEDO:  My husband and I.

16          THE COURT:  Thank you very much.

17          Unless there's something else you'd like me to know.

18          MS. OLMEDO:  No, thank you.

19          THE COURT:  Thank you.

20          Next I have Miham Espinoza.  Ms. Espinoza, do you need

21   the help of an interpreter?

22          MS. ESPINOZA:  No.

23          THE COURT:  Please come to the podium.

24          Ms. Espinoza, are you related to Ms. Olmedo?

25          MS. ESPINOZA:  Yes.

P2qFamaS

1          THE COURT:  I was just wondering why you were handing

2     off your child to someone, and congratulations.

3          MS. ESPINOZA:  Thank you.

4          THE COURT:  What would you like me to know, please.

5          MS. ESPINOZA:  I wanted to let you know that I'm here

6     on behalf of my husband.

7          The same, we trusted the lawyer to do his job, but he

8     didn't.  Right now, we don't even know where our case is at, so

9     we're just wondering what's going to happen now.

10          THE COURT:  Yes, of course.  And I understand that.

11          So there was a petition for your husband to obtain a

12     green card or to naturalize?  Was it to obtain a green card?

13          MS. ESPINOZA:  A residency, yes.

14          THE COURT:  I see.

15          And is he not here because he doesn't have that?

16          MS. ESPINOZA:  Yes.

17          THE COURT:  And you do?

18          MS. ESPINOZA:  Yes.

19          I was born here.

20          THE COURT:  I see.  Thank you.

21          Yes.  I'm sorry that I don't know what is the status

22     of those cases or what will happen going forward.

23          Are there other things you'd like me to know that your

24     mom didn't tell me about?

25          MS. ESPINOZA:  No.

1           THE COURT:  Thank you for coming today.  Thank you.

2           MS. ESPINOZA:  Thank you.

3           THE COURT:  I next have Octavio Garcia and Nagely

4    Garcia.  They might be -- Did they come together?  Yes.

5           And would you like the services of an interpreter, or

6    are you -- yes, please?

7           Ms. Iliakostas, can we borrow you again?

8           Thank you.

9           THE INTERPRETER:  Yes, your Honor.

10          THE COURT:  Is there one of you who would like to take

11   the lead in speaking this afternoon?  Mr. Octavio Garcia?

12          MR. GARCIA:  I want to be first.

13          THE COURT:  Thank you.

14          And may I know your relationship?

15          MR. GARCIA:  She's my daughter.

16          THE COURT:  I thought as much.  Thank you.

17          Go ahead, sir.

18          MR. GARCIA:  Good afternoon.

19          THE COURT:  Good afternoon, sir.

20          MR. GARCIA:  I'm here to tell you all the damage that

21   this lawyer, Amankwaa, has done to us.

22          You know, I had my last meeting with immigration in

23   May, and one of the questions that I was being asked was if I

24   was being abused by my daughter.

25          THE COURT:  Ah, your daughter was the person who was

1   alleged to be abusing you.

2           MR. GARCIA:  Well, this is what the attorney said.

3           THE COURT:  Of course.  Okay.

4           MR. GARCIA:  He told me that because my wife was

5   deceased and because my daughter was already 21 years old, she

6   could help me with my immigration status.

7           THE COURT:  Okay.

8           MR. GARCIA:  Which, when I had to answer that

9   question, that I was not being abused by my daughter, I

10  appeared to them to be fraudulent.

11          From that date on, your Honor, my life has been a

12  living hell.  I don't know what's going to happen with me.

13          I am a diabetic.  I have lost a lot of weight.  I have

14  only one good eye, and that eye is now getting very blurry

15  because of the increase of sugar.  I'm very sick.

16          THE COURT:  And is the case, sir, that you're

17  reluctant to seek medical attention because of your concerns

18  about your status?

19          MR. GARCIA:  Well, yes.

20          Because of the situation, I am afraid to do anything.

21  I'm afraid to go to church.  I'm afraid to go to the doctor.

22  I'm afraid to go out or do anything.

23          And it's not fair that because of someone so

24  unscrupulous like him someone who is greedy, someone who just

25  loves money, that now we need to be or have to be separated.

P2qFamaS

1          THE COURT:  Thank you.

2          Ms. Garcia, do you wish to add anything?

3          Please come just a little bit closer.

4          Thank you.

5          MS. GARCIA:  I'm the only daughter from my mom's side

6   and my dad's side.  Unfortunately, my mom passed away ten years

7   ago.

8          After we found out about what Amankwaa has done to us,

9   I've been living with fear, because I don't know what's going

10  to happen to my dad.  My dad is the only thing I have in here.

11  I'm always scared of what's going to happen to him or what's

12  going to happen to me.

13         It's -- it's -- I think it's very unfair to my family

14  and everybody's family that we have to pay for what he has

15  done.  We didn't do anything wrong but to trust him, so we

16  really hope he gets what he deserves.

17         Yeah.

18         THE COURT:  Thank you very much.  Thank you.

19         You're both welcome to sit down.

20         I thank you both for coming this afternoon.

21         I next have Ricardo Velazquez.  Is Mr. Velazquez here?

22         Mr. Velazquez, do you need the assistance of an

23  interpreter?

24         MR. VELAZQUEZ:  No.

25         THE COURT:  Please come forward, sir.

1          MR. VELAZQUEZ:  Hi, your Honor.

2          THE COURT:  Good afternoon, sir.

3          MR. VELAZQUEZ:  Good afternoon.

4          My name is Ricardo Velazquez.  I'm here to speak on

5     behalf of my family.  Unfortunately, they couldn't be here.

6          THE COURT:  Of course.

7          I'm going to ask you this question or favor, sir.

8     This courtroom has a lot of people in it, and the acoustics are

9     not great; no.  I'll just ask you to speak up and speak slowly.

10          MR. VELAZQUEZ:  Okay.

11          THE COURT:  Because we all want to hear what you have

12     to say.

13          Go ahead.

14          MR. VELAZQUEZ:  All right.  First, I just want to say

15     thank you to the government for prosecuting Kofi Amankwaa and

16     all the families here standing up and giving their testimonies.

17          I am the high-profile case, I guess you can say Victim

18     1 that stood up publicly announcing against Kofi Amankwaa when

19     my father was deported.

20          We came to Mr. Kofi in early April 2021 in

21     consultation to try to figure out how we can help my parents'

22     legal status.  He gave us hopes and highs in terms of that I

23     could sponsor my family, which was never the case.

24          We trusted Kofi.  We came to find out that I was set

25     up as an abuser against my parents, both my mom and my dad,

1  which was never the case.

2          Based on my job employment, that affected my job, too,

3  because I was notified that I was said as an abuser, which was

4  never the case.  I had to fight that case with my employment,

5  too.

6          THE COURT:  Did you lose your job, sir?

7          MR. VELAZQUEZ:  No.  Thankfully, no.

8          THE COURT:  But there was some sort of administrative

9  proceeding or inquiry because your employer learned that

10  someone had identified you as an abuser.

11          MR. VELAZQUEZ:  Correct; yes.

12          THE COURT:  That's fully cleared up now, sir?

13          MR. VELAZQUEZ:  It's cleared up.  Yes.

14          THE COURT:  Please continue.

15          MR. VELAZQUEZ:  Furthermore, when we came to Mr. Kofi,

16  we tried to figure out what was the next step.  Of course, like

17  everybody else, he kept everybody in the dark, never notifying

18  anything to us.

19          When my dad was given the employment authorization,

20  according to Kofi Amankwaa statement that he was giving to

21  everybody else, requirements, me and my family planned a family

22  vacation.

23          Both my parents came into this country at the age of

24  15, 28 years here in this country.  They consider themselves

25  Americans.  They worked here their whole lives, did the things

1   the right way, had four kids, including myself as the oldest --

2   I guess you can say living the American dream, thanks to them.

3           And, unfortunately, when we traveled to Mexico, came

4   back, 2023, end of February, the unthinkable happened:  My dad

5   was detained at JFK.

6           I tried to see -- I tried to figure out what to do.  I

7   couldn't figure out anything.  They just kept me on the blue

8   until my mom came out and she was told -- luckily, she wasn't

9   detained and deported, but she was told that my dad was going

10  to get deported.

11          THE COURT:  He was, sir?

12          MR. VELAZQUEZ:  He was sent to New Jersey detention

13  center for a month for proceedings, and then after that, he was

14  deported April 14, on a Friday.

15          When I was trying to figure out why my dad was being

16  detained, according to Immigration Customs at JFK, they asked

17  me if our lawyer was Kofi Amankwaa.  And when I was told about

18  it, I was in shock.  I was like, how do you know about it?  So,

19  they had told me that they already about Mr. Kofi Amankwaa

20  fraud, his fraudulent activity.

21          And so for us as a family of six, it was a big impact

22  on all of us, because my dad was the source of income.  He was

23  the man of the house.  We are a very united family.  We're good

24  hardworking people; we mean no harm to anybody.  We do the

25  things the right way.

1          So when my dad was deported, it affected all of us

2     mentally, economically.  I had to take charge of my mom.  My

3     mom was in a very depressive state, because she was taken away

4     from my father.

5          Both my sisters were, on that year, 2023 were -- I'm

6     so sorry.

7          THE COURT:  No, don't -- please.

8          Just take a breath.  The tissues are right to your

9     right, sir.  You can take whatever time you need.

10          MR. VELAZQUEZ:  Both of my sisters were also

11     graduating that year, so it was a -- you know, my sister going

12     into college, the little one going into high school, and then

13     my little brother, of course, in college.

14          So I had to be the man of the house, take all of the

15     responsibilities in the house, take care of my mom, my sisters,

16     make sure they were all all right, knowing that they were going

17     through it all in their own way, right?

18          THE COURT:  Yes.

19          MR. VELAZQUEZ:  And -- sorry.

20          THE COURT:  You owe us no apology, sir.

21          MR. VELAZQUEZ:  For my father, at the end of the day,

22     my father was the one that took the biggest hit, because my

23     dad's worked here his whole life, paid his dues, taxes, all

24     that, followed the law, and for this man to just lie to us and

25     take advantage of our trust, telling us that he could help my

parents get their legal status the right way was never the case.

And unfortunately, my dad had to -- well, me and my family -- my dad, the one that was being deported, took the biggest hit.

THE COURT:  Yes.

MR. VELAZQUEZ:  For my father, it was a really bad experience, him being sent back home, because he was separated from his family.  Back home, he didn't have anybody really to rely on.  He had to figure things out on his own.  My dad was very depressed.

There were times that my dad just wanted to give up on us and just let it be, but, you know, me being the oldest son, I had to push hard and try to finance and me to try to help my family and help try to keep my family together.

THE COURT:  What is the current state of affairs now, sir?  You're working?  You're out of school?

MR. VELAZQUEZ:  Yeah.  I'm working.

THE COURT:  You're working.

MR. VELAZQUEZ:  Yeah.  Full time.

THE COURT:  Your brother is in college?

MR. VELAZQUEZ:  He's pursuing his masters now.

THE COURT:  Congratulations to him.

Your sisters, one in college --

MR. VELAZQUEZ:  One in college and one in high school

P2qFamaS

1    now.

2              THE COURT:  Okay.  Oh, wait.

3              The graduation, the graduation was from grammar school

4    and high school, to go into college and to high school?

5              MR. VELAZQUEZ:  Yes.  Yeah.

6              THE COURT:  Thank you.

7              Okay.  Your dad is still -- he's not here?

8              MR. VELAZQUEZ:  Well, he's not here in the Court, but

9    he's here.  He's back home with us.

10             THE COURT:  He's back home.  Okay.

11             MR. VELAZQUEZ:  Thankfully, you know, I was able to

12    make it happen for my father.  I guess you could say, miracle.

13             It's just been really tough for all of us.  And the

14    big question for me here and, I think, for everybody else, I

15    could just say is just to ask Kofi Amankwaa, why do you have to

16    do what you did?

17             I just think it was very inhumane, taking advantage of

18    all the vulnerable families, you know?  I just found out he was

19    an immigrant, himself.  So my question is, why would you have

20    to take advantage of the system and take advantage of all the

21    family members that trust in him.

22             He guided them and just -- you know, we all lost money

23    at the end of the day.  My family lost about seven to $8,000

24    just in fees and stuff like that, making it seem like we were

25    doing the right thing, which was never the case.

1          And that's pretty much it.

2          THE COURT:  Thank you very much for your time, sir.

3          MR. VELAZQUEZ:  Thank you.

4          THE COURT:  Aris Suarez.

5          Mr. Suarez, do you need the assistance of an

6      interpreter?

7          MR. SUAREZ:  No; I don't.

8          THE COURT:  Okay.  Thank you.

9          Please come forward.

10          MR. SUAREZ:  Thank you, your Honor.

11          THE COURT:  Good afternoon to you, sir.

12          MS. RAMOS:  My name is Aris.  My full name is Aris

13      Arnold Adrian Suarez Cuazitl, long name, but I'm here speaking

14      on behalf of my parents.

15          They obviously can't attend.  They don't feel safe

16      being here, especially with the way things are in our

17      community.  But I want to speak on their behalf.  I've had

18      permission to do so.

19          THE COURT:  You do, sir.

20          MS. RAMOS:  Yes.

21          Just like my parents, my parents are victims of

22      immigration fraud by Kofi Amankwaa.  Unfortunately, this

23      happened in November of '21, and that's when I found out I was

24      listed as an abuser to my parents, without their consent, of

25      course, without their knowledge.  He took my parents in,

signing documents with no Spanish interpreter just to get a

payday, obviously, from innocent people just like my parents.

Completed an I-360, filed the form without my parents'

Full understanding of the document in order for them to get

their work authorization and Social Security cards.

This crime has severely impacted my life and I am --

sorry.  This is hard.

THE COURT:  No, no, of course it is.  We understand.

MR. SUAREZ:  I just want to see them be brought to

justice.  I want them to get justice.

THE COURT:  Now, if I may, sir --

MR. SUAREZ:  Yeah.

THE COURT:  You mentioned that you were speaking on

behalf of your parents, and I think I have an understanding of

what they've gone through and why they're not here today.

With respect to the particular way in which this

affected you, is it because, for example, you were listed as an

abuser somewhere and you had employment or education issues, or

is it the stress that you felt with your parents as they went

through this process?

MS. RAMOS:  It's the devastating stress that we

received through finding this out.  I am a U.S. citizen, and

for as long as I can remember, you know, my parents have been

amazing people.

Since the start of everything, they really set their

1    hearts into everything for us, into everything they do.  They

2    showed us, really, the true value of education and being

3    well-spoken.

4            I really do absolutely want them to be safe.  I want

5    them to be healthy as much as I can.  We work to the medical

6    field as well, so my passion for helping others and really

7    being there for others in their time of need really stems from

8    their selfless acts.  I've learned that from them the most.

9            So you could only imagine how I found out.  I wanted

10   to help them.  I really wanted to help them find a way to get

11   their -- change their statuses in the U.S.

12           That's when -- when I turned 21, I promised to find a

13   way to help them.  I didn't know where to start, but my father

14   heard about Kofi, Kofi Amankwaa through a friend of theirs, and

15   he went to go try get some information so we can get this whole

16   thing started.

17           THE COURT:  Just a little bit slower, so I can take

18   down notes.

19           MS. RAMOS:  Of course.  I'm so sorry, your Honor.

20           THE COURT:  No.  That's okay, sir.  Go ahead.

21           MR. SUAREZ:  So my parents decided to make an

22   appointment with this lawyer, Kofi Amankwaa, and he was in the

23   Bronx.  I trusted my parents to go meet with this lawyer, since

24   I had complete faith in the justice system and the legal

25   system, of course.

1        I always believed that he really had our best

2    interests at heart.  I never need he had a lawyer before.  I

3    would always assume lawyers have are the most honorable and

4    honest people.  They represent the people and they protect us

5    from when we need it the most.

6        They had their appointment back in November of '21.

7    My parents were there all day when they were initially in the

8    process of getting their documents.  I remember asking them how

9    they were so confident that they were getting these documents

10   to begin with, their Social Security numbers or authorization.

11   They just told me that they met the lawyer Kofi, and he just

12   told them he has done this many times; he had no issues at all.

13   I was confused, but he's a lawyer, so I have to trust him.

14        They both got their employment advance documents and

15   their --

16        THE COURT:  You mean the advance parole documents,

17   sir?

18        MS. RAMOS:  Yeah, and social security card numbers.

19        And obviously, we all cried because it's happening.

20   It seemed to be happening.  Obviously, I was hesitant at first

21   but it happened, and I was so happy that it did.

22        But I still asked my father to go check to see if

23   these produced documents were legitimate.  And obviously, he

24   did.  My parents then explained to me that there was some sort

25   of two-step process on how to get their green cards.  Either

they were told that they had to travel to Mexico, since he had

advanced parole and entering the U.S. legally just seemed like

a dream to me and my parents.

I didn't know what to believe at that point, but we

were struggling financially, since Kofi's fees were

substantially expensive. I used up a significant amount of my

savings to give my parents a round-trip flight from JFK to

Mexico.

And once they finally decided to go back, I was happy.

For once, I felt like they could finally step out of the

shadows and be welcomed into this beautiful country we live in

with open arms, and they could finally go back after not being

home for 25 years.

During their time away, I was praying every day for

their safety, not knowing what may be, you know, since they

grew up in an area that was ridden with a significant cartel

presence and gang members.

Obviously, on the day of the flight back, full of

anticipation, I had no idea what the agents would do when they

arrived. I prayed especially hard on this day, and they came

out fine, and we hugged and we cried. This is a moment that

will forever be a core memory for me.

So, how did it all go bad? I'm telling you, for so

many years, they'd been in hiding, in constant fear, because

they were scared of deportation at any moment. They could only

1    get jobs that offered cash with very low wages all their lives.

2         Eventually, my siblings and I, all of them, we

3    received the great education, a home, food on the table, and

4    really essential family values because of them and their

5    teachings.  They are not bad people; they are not criminals.

6    They are the absolute kindest souls that I know.

7         Several months after the flight, we went back to Kofi.

8    We had made some savings in the meanwhile to get this, quote on

9    quote, second part, done.  I requested time off for the second

10   part, and I was astounded by how packed his lawyers' office

11   was.  It was so packed, there was no room to go in.  It was

12   stretched out to the hallways.

13        I waited 11 hours that day with my parents to finally

14   get to see this lawyer.  Finally, get to sit down with him, and

15   he just got right into it.  Said he wanted to see the stamps of

16   the passports that we got for them since they flew, and he told

17   us we were eligible to do the second step for their green

18   cards, telling me they would be able to go because of me,

19   because I'm an American and I'm over 21 years of age.

20        Without my help, they could not travel or return to

21   the U.S. or finish this case.  I felt great about him telling

22   me that I helped my parents.  Kofi never once or at all ever

23   mentioned about an abuse case to us or that he filed a VAWA for

24   them to travel and never said anybody had to lie.

25        Up until this moment, I had really trust for Kofi,

1    since everything he said happened.

2         He had my parents and I sign some documents to get to

3    the second part.  He said it was just to change the illegal

4    alien status of my parents to a legal status for a green card.

5    I did my best to read through everything, but after 11 hours,

6    I'm tired, I'm hungry, I'm sleepy at this time.  After a while,

7    11 hours of waiting, I just wanted to get things moving.

8         My parents had always sacrificed so much for us.  Now

9    is my turn to return the favor.  I promised them that that was

10   not all in vain, all those years of suffering.

11        We all signed on the pointed areas that he held the

12   papers.  The whole time I was signing, and I never looked at

13   them, because he never showed it to us.

14        THE COURT:  And therefore, you did not know that this

15   was a VAWA petition and that you were the alleged abuser.

16        MR. SUAREZ:  That is correct, your Honor.

17        He said congratulations; we'll be sending out the

18   paperwork.  He just needed his fees paid: 6,000 per person for

19   the initial visit, so, 12,000, and now the second step would be

20   3,000 per person.

21        Can you imagine $18,000 already out?

22        THE COURT:  18,000, sir.

23        MR. SUAREZ:  At this point.

24        I had borrowed money from friends, family, used up all

25   my savings, my parents have used all of their cash savings

1    they've saved up over the past 25 years to pay for his fees,

2    legal fees, doctors' fees, everything.

3           Then I started to hear rumors about a lawyer in the

4    Bronx who made a fraud on innocent immigrants and their

5    children.  I never thought about how that would be affecting my

6    parents until I turn on the TV, on NBC news.  There, I saw my

7    lawyer, Kofi, on the screen, being accused of immigration

8    fraud.  My heart sank.

9           My father just assured us that it was all a

10   misunderstanding, that we would see Kofi tomorrow, since they

11   were not answering the phones.  And we did go back the

12   following day.  And again, we saw a sea of people having the

13   same concerns we did.  Finally got to speak with someone, and

14   they told us not to believe the news report.  They told us that

15   the man in the news report left the U.S. with a card that says,

16   not advance proposal, and that's why he got deported.  They

17   insisted that we trust him, since my parents were able to go to

18   Mexico and come back just fine.

19          It was a hard pill to swallow, but I had to trust Kofi

20   and his team.  Everything he did say up until this point really

21   happened.

22          After months of waiting, I could no longer wait.

23   Something was eating me up inside.  I had to find out if Kofi

24   was an honest man.  Rumors of him committing fraud were too

25   great, and they grew day by day.  After several weeks, a FOIA

1    request was submitted, and it proved that Kofi listed me as an

2    abuser in these VAWA forms.

3           Since then, we've been scared, especially with the new

4    administration.  Now, both my parents are Type 2 diabetics;

5    they do depend on insulin.  They both have hypertensive issues.

6    The also have kidney issues, so they don't even feel

7    comfortable going to local hospitals anymore.

8           Honestly, what Kofi did to us, I don't have a name for

9    it.  I honestly don't.  And the way he affected, not just me,

10   personally, but I read thousands of stories at this point -- or

11   what feels like thousands of stories -- of other people in my

12   shoes.  I just cannot believe.

13          Now knowing that he was an immigrant himself, I

14   thought he would have understood what it's like to be scared or

15   maybe concerned or finally reach that American dream and be

16   here.  I can't speak on his behalf, but I am so scared.

17          THE COURT:  For your parents.

18          MR. SUAREZ:  I am.

19          I just want to say, for everyone that was affected --

20   not just, obviously us, the victims, but obviously, this also

21   affects other agencies, government agencies that are involved

22   in this -- I am so sorry that you have to deal with all of

23   this.  I do appreciate all of your time and effort that you're

24   spending into getting this all, getting us all a platform so we

25   can finally speak our feelings.

1    We have true intentions, you know. My parents have

2 been here for so long. They've paid taxes. They've pay their

3 taxes every single year. They work hard every day just to give

4 us food. We're all -- you know they put me through college.

5 My siblings are still in college at this time.

6    They're not bad people. They're not criminals. They

7 just wanted to do something right, and unfortunately, the way

8 this -- the way Kofi committed this immigration fraud on us is,

9 it's crazy.

10    Thank you.

11    THE COURT: Thank you very much.

12    MR. SPODEK: Your Honor, may we just have a quick

13 recess so that Mr. Amankwaa can use the restroom before you

14 call the next witness?

15    THE COURT: Yes.

16    We have three more. He doesn't want to wait for the

17 three. It's fine either way. Kay.

18    MR. SPODEK: He asked.

19    THE COURT: We're going to take a ten-minute recess,

20 and everybody meet back here.

21    Thank you all very much.

22    The next person to speak is Marjhorie Bazan, when we

23 come back.

24    (Recess)

25    THE COURT: May I please have Marjhorie Bazan come

P2qFamaS

1    forward, if Ms. Bazan wishes to speak?

2              Did she step out?

3              UNIDENTIFIED SPEAKER:  Yeah.

4              THE COURT:  Okay.  I'll do a second call for her,

5    please.

6              I next have Hedy Flores, if Ms. Flores wishes to

7    speak.

8              Ms. Flores, do you need the assistance of an

9    interpreter?

10              MS. FLORES:  No.

11              THE COURT:  Would you please come to the podium?

12              And, Mr. Margulies, is there something you want me to

13    know, sir?

14              MR. MARGULIES:  Yeah.

15              Just a brief remark, your Honor, if I may.

16              THE COURT:  You may, sir.

17              May she walk up as you do that?

18              MR. MARGULIES:  Yes, your Honor.

19              MS. FLORES:  I'm sorry.

20              May my sister join me?

21              THE COURT:  You may.

22              Sir.

23              MR. MARGULIES:  As a brief clarifying remark, I

24    believe Mr. Suarez referred to an employment authorization when

25    he was speaking.

1          THE COURT:  Yes.

2          MR. MARGULIES:  So I just wanted to clarify for the

3     Court -- if it wasn't clear previously -- that the government's

4     understanding is that the first step of the process that

5     Mr. Suarez was describing when he got the advance parole

6     document, based on the government's investigation, Mr. Amankwaa

7     would often get an employment authorization and a Social

8     Security number for the clients at the same time, and I think

9     that also helps explain why, even when the ultimate process was

10    often unsuccessful, the fact that he could help was spreading

11    through word of mouth.

12         THE COURT:  That, I understand.

13         I appreciate the clarification.  Thank you.

14         All right.  So, this is Ms. Flores.

15         Ms. Flores, thank you.

16         And your sister's name is, please?

17         MS. FLORES:  Jackie Flores.

18         THE COURT:  Jackie Flores.

19         And will you be speaking on behalf of both of you?

20         MS. FLORES:  We will be speaking separately.

21         THE COURT:  Okay.  Let me hear from you, please.

22         MS. FLORES:  Okay.  Good afternoon, everyone.

23         THE COURT:  Good afternoon.

24         MS. FLORES:  As I'm hearing many cases, we all are

25    going through the same thing.  But I do want to point out, as

P2qFamaS

1    immigrants, particularly the Hispanic community, we work

2    tirelessly.  We dedicate ourselves to our family, to the

3    American Dream, and to a better life with every penny saved,

4    with years of hard labor, sacrifice, and dedication --

5              THE COURT:  I'm just going to ask you to go a little

6    slower.  We both need to take down what you're saying.

7              Go ahead.

8              MS. FLORES:  All right.  This man called lawyer, took

9    advantage of our vulnerability and trust, making false

10   promises, and in my case, falsely accusing me of things I never

11   did.

12             THE COURT:  You were the "abuser" to your parents?

13             MS. FLORES:  Correct.

14             THE COURT:  Are you speaking on behalf of your

15   parents?

16             MS. FLORES:  Yes.

17             THE COURT:  You both are speaking on behalf of your

18   parents?

19             MS. FLORES:  Yes.

20             THE COURT:  Are your parents not here because they are

21   uncomfortable being in court today?

22             MS. FLORES:  Yes; correct.

23             THE COURT:  Thank you very much for coming on their

24   behalf.

25             Go ahead.

1          MS. FLORES:  So, the defendant went for us to claim

2     that I had abused my parents violently and forged signatures on

3     behalf of myself and other testimonies.  And I know that

4     forging signatures is very serious.

5          These lies were part of a larger fraudulent scheme to

6     manipulate the process and deceive me into giving up more of my

7     hard-earned savings.

8          This is not simply a case of someone making a mistake;

9     this is a calculated fraud of ambition where he used my

10    personal situation to build and a narrative that was entirely

11    fabricated.

12         The accusations were not only malicious, but also

13    damaging.  To have my integrity questioned in such a way is

14    beyond hurtful.  To claim that I had harmed my family, mostly

15    my parents, and falsified documents is not only untrue, but in

16    an insult to everything I stand for.  And for what?  So he

17    could buy more time, so he could continue to take my parents'

18    money and under false presences?

19         The process of receiving a visa is already difficult

20    enough, and to add fraudulent actions on top that only serves

21    to destroy trust and faith that immigrants have in the system.

22    For the defendant to deceive me and, likely, others in the same

23    way by demanding money for false services is unacceptable.

24         I stand here to discuss details of my parents'

25    situation, but to speak as well on behalf of those who have

1      been victimized.  It is my hope, your Honor, that you recognize

2      the harm that he has caused, not just financially, but

3      emotionally and psychologically as well.

4            We came -- my parents came to this country seeking a

5      better life, and he exploited that hope.  I do ask for justice,

6      not just for me, but for every immigrant parents sitting here

7      in this court and for those that couldn't attend here in

8      person.

9            These fraudulent schemes are very serious, and like I

10     mentioned, the forged signatures that he did on behalf of me

11     and my parents' friends to test for the violent abuse against

12     me and --

13           THE COURT:  Just, please, pause one moment.

14           You indicated to me that you were identified as the

15     "abuser," and you're watching me put air quotes around that

16     term because your statement to me is that you are not.

17           When you're talking about forging, I might be

18     misunderstanding things.  Were you alleged to have forged their

19     signatures, or was your signature or their signatures forged on

20     documents submitted in connection with these applications?

21           MS. FLORES:  My signatures and my parents' friends,

22     who, apparently, saw that I was abusing my parents, which, I

23     really wasn't.

24           THE COURT:  Yes.  So those signatures -- so,

25     someone -- not you -- signed your name to an attestation that

P2qFamaS

1    station that you abused your parents.

2                    MS. FLORES:  Correct.

3                    THE COURT:  And some family friends' names were used

4    to attest to having witnessed the abuse.

5                    MS. FLORES:  Yes.

6                    THE COURT:  Thank you for the clarification.

7                    Please continue.

8                    MS. FLORES:  Yes.

9                    MS. RODRIGUEZ:  Hello, your Honor.

10                    My name is Jackie Flores Rodriguez, and I'm here on

11   the behalf of my parents.

12                    THE COURT:  Welcome to you as well.

13                    Thank you.

14                    MS. RODRIGUEZ:  Well, I would like to add to what, y

15   sister said about him forging signatures.

16                    I remember he asked my mom and both my parents for two

17   American citizens' identifications, which we then asked --

18   well, my mom asked her two friends, which was Wendy, and then

19   she's Dominican, and then Orlando, which is one of my dad's

20   friends.  He's Peruvian.

21                    In the note, we saw that he lied, saying that my

22   sister abused, hit my parents in a party, saying that my sister

23   was verbally and physically abusing them, which is totally

24   untrue.  My sister would never hurt anyone, especially our

25   parents that have came here for a better future and made

1    everything possible for us.

2              Sorry.

3              THE COURT:  It's okay.  Please.

4              MS. RODRIGUEZ:  He -- I remember that day.  I had to

5    wait five hours.  It was me who went to go leave the

6    identifications to him.

7              I asked him what those were for.  He said:  Oh, don't

8    worry about it.  We just need them.  It's something quick.

9    Don't worry about it.

10             Later, I found out he made those -- he made something.

11   I think it was like, dear -- my name is Wendy Ortega.  I am

12   from Mexico -- which, clearly, that's untrue, because she's

13   Dominican.  He also lied with Orlando, because he said that

14   he's Mexican, which is untrue; he's Peruvian.

15             I just want to know how inhumane can he be to steal

16   dreams, not only from our parents, but from us.

17             Yeah.  That's all I have.

18             Sorry.

19             THE COURT:  No, no.  Take a breath.

20             MS. RODRIGUEZ:  Yeah.  That's all.

21             THE COURT:  Thank you both very much.

22   Thank you.

23             MS. RODRIGUEZ:  Thank you.

24             THE COURT:  A second call on Marjhorie Bazan.

25             Ms. Bazan, do you nee the assistance of an

1  interpreter?

2           MS. BAZAN:  No, thank you.

3           THE COURT:  Thank you.

4           Please come to the podium.

5           MS. BAZAN:  Good afternoon, your Honor.

6           THE COURT:  Good afternoon.

7           MS. BAZAN:  My name is Marjhorie Bazan, and as I stand

8  here today, it feels surreal to relive one of my family's most

9  traumatic experiences.

10          It all began on December 2019.  My mother, Maria

11 Asuncion Escamilla Najera confided and trusted Mr. Kofi

12 Amankwaa in taking on her immigration case.  He discussed that

13 I would be able to help my mother fix her immigration status on

14 the basis of being an American citizen.  Little did we know

15 that having Mr. Amankwaa represent my mother would begin the

16 nightmare that she lives in today.

17          And as I hear all these stories, it seems like it's

18 the same nightmare.  Our parents all work hard.  They all pay

19 their taxes.  To hear that Mr. Amankwaa has not paid his taxes

20 in four years is adding fuel to the fire for me, personally.

21          I work for the city of New York.  I'm a child

22 protective specialist.  I could have lost my job.  He put

23 claims that I hit my mother.  I never once have even yelled at

24 my mother to the point where she has to call the cops on me.

25 So I believe that we're all in our feelings of sadness, but

1    we're all extremely angry.  I know I am.

2            And he did promise a lot.  And whenever we would go to

3    his office, he would treat us, honestly, like trash.  He would

4    make us wait for hours, sometimes 12 hours, letting us know:

5    Just sit here.  Just wait.  Just sit here and wait.  He

6    wouldn't explain the documents.  He would just tell us to sign

7    things.  And of course, as, you know, our parents wanting this

8    dream of having the advance parole and going to Mexico, we were

9    signing off on documents.  But he was telling us that this is

10   the process.

11           On March 28, 2023, I sat down with Kofi, my mother,

12   and we went over what the immigration officer would ask us.  He

13   then informed me that he -- that I would have to say that I hit

14   my mother.

15           THE COURT:  Oh, he told you.

16           MS. BAZAN:  Oh, he did.  He definitely did.

17           THE COURT:  Which may distinguish you from some of the

18   others here.

19           MS. BAZAN:  When I asked him:  Why would I say that?

20   He simply replied, it's a loophole.  And when you mentioned

21   that today at court, it stood out to me, because that's what I

22   wrote in my paper.  He said it was a loophole.

23           I looked at my mother.  We both knew we could not

24   continue this lie, so when my mother had her appointment with

25   the immigration officer, she simply stated the facts.  Mr. Kofi

1   Amankwaa falsified records and submitted a VAWA application

2   without my mother's consent.

3           THE COURT:  One moment, please.

4           I just want to make sure I understand this, Ms. Bazan.

5   You were at a meeting with your mom and with Mr. Amankwaa, and

6   he advised you and your mom that the application would involve

7   you attesting to being violent towards your mother.

8           MS. BAZAN:  Yes, your Honor.

9           THE COURT:  You refused to do that.

10          MS. BAZAN:  Yes, your Honor.

11          THE COURT:  He, nonetheless, submitted an application

12  in which somebody said that you were violent towards your

13  mother.

14          MS. BAZAN:  He had submitted this before the fact.

15          THE COURT:  I see.  Thank you.

16          Thank you for the clarification.

17          MS. BAZAN:  And that was a few days before her

18  interview with the USCIS officer on April 20, 2023.  He wanted

19  us to continue this lie that he had made up with the VAWA

20  application.

21          The day of the interview, my mother said the facts,

22  that Kofi submitted this application without her consent.

23          THE COURT:  That's the first time you learned of it.

24  That's the first time that she learned of it.

25          MS. BAZAN:  Yes.

1    My mother, therefore, was denied her application, and

2    she was charged with fraud.

3          THE COURT:  Please excuse me.

4          When you say charged with fraud, is that the

5    accommodations came back denied with the reason being fraud, or

6    was your mother actually arrested and criminally charged with

7    fraud?

8          MS. BAZAN:  No.  The first statement.

9          THE COURT:  No I'm not minimizing that.  I just want

10   to make sure when you say words like, charged with fraud, I

11   hear things that you're not saying.

12         MS. BAZAN:  Okay.

13         THE COURT:  So, she got something in the mail that

14   said application denied.  Why: fraud.

15         MR. SUAREZ:  Exactly.  Yes, your Honor.

16         THE COURT:  Thank you.

17         MS. BAZAN:  I could sense so much fear in my mother,

18   fear of being in trouble, fear of being deported of being in

19   trouble with the federal government, fear of the financial

20   strain as she has used her savings to pay for her legal fees

21   with Mr. Amankwaa -- a minimum of $6,000 -- but most

22   importantly, the fear of losing her family.

23         Thankfully, I was able to connect with other victims

24   is of Mr. Amankwaa's immigration scheme.  Together, we were

25   able to get help from the attorney general.  My mother as

1    helped in making a statement.

2           However, my mother has not been the same.  Since my

3    mother's letter from the immigration, the USCIS, her mental

4    health has declined.  She is currently prescribed antianxiety

5    medication.  She's enrolled in therapy.  She's had panic

6    attacks at home where we've had to contact EMS, and, again,

7    fearful of going to the hospital.

8           My mother's physician has --

9           THE COURT:  One moment, please.

10          So your mom is being prescribed antianxiety

11   medication.

12          MS. BAZAN:  Yes.

13          THE COURT:  But if she were to ever have a panic

14   attack that required hospitalization, she wouldn't go.

15          MS. BAZAN:  No, she would not, on the fear of being

16   deported.

17          THE COURT:  I understand.

18          Is she still seeing her doctor?

19          MS. BAZAN:  She sees her doctor at a community center,

20   her therapist at a community center, and her physician is at a

21   small clinic around where we live.

22          THE COURT:  Will she continue to receive the mental

23   health medication?

24          MS. BAZAN:  I believe so.

25          I push her to do it.  I push her to do it.

P2qFamaS

1          THE COURT:  I have no doubt.

2          MS. BAZAN:  My mother's physician actually recently

3     just doubled her dose.  With the change of the administration,

4     her anxiety has just been off the roof.

5          My mother is a hard worker, a fighter, a role model.

6     She is the glue of our family.  Her being deported simply does

7     not make sense.

8          I'm sure, standing here today, Mr. Amankwaa does not

9     remember me or my mother, as we have are many -- one of the

10    many victims of this scheme.

11         He does not remember our hopeful faces or the dread in

12    our voices when we asked him why he submitted the VAWA

13    application, and again, he responded, simply: it's a loophole.

14    But we do remember him and lies he told.

15         I don't believe we could ever move past this.

16    However, I came here today to speak out on this, to shed light

17    on this case, and for Mr. Kofi to know we will not stand for

18    this.

19         Lastly, I want to thank the justice system in assuring

20    that Mr. Amankwaa is sentenced and that justice will prevail.

21         THE COURT:  Thank you very much.

22         MS. BAZAN:  You're welcome.

23         THE COURT:  I have Ms. Jaqueline Miranda, if

24    Ms. Miranda is still here.

25         Ms. Miranda, please come forward.

P2qFamaS

1           Ms. Miranda, do you need an interpreter this

2   afternoon?

3           MS. MIRANDA:  No.

4           THE COURT:  Okay.  Thank you.

5           Please come to the podium.

6           And Ms. Clancy, if there is anyone else that you

7   believe is going to be speaking, please let me know.  Last's

8   the last I have on my list.

9           Thank you.

10           Thank you, Ms. Miranda.  Welcome, and good afternoon

11   to you.

12           And I thank you, all, very much for your patience this

13   afternoon.

14           MS. MIRANDA:  Thank you.

15           Good afternoon.

16           Your Honor, due to Mr. Amankwaa's negligence and

17   fraud, my father has been stuck in Mexico for almost two years

18   after residing in New York City for more than 30 years.

19           We trusted Mr. Amankwaa to help our family, but

20   instead, he caused intentional harm.

21           My father would miss countless hours of work due to

22   Mr. Amankwaa's lack of organization.  He would misplace

23   paperwork, filed petitions late, and gave reckless advice.

24           THE COURT:  And the "he" of which you speak is

25   Mr. Amankwaa?

1          What you're saying is that your dad lost time because

2     things would have to be repeated or redone because of errors or

3     losses.

4          MS. MIRANDA:  Yes.

5          THE COURT:  Thank you for the clarifications.

6          MS. MIRANDA:  He would misplace paperwork, filed

7     petition late, and gave reckless advice.

8          He told my father to leave the United States to attend

9     his immigration appointment in Ciudad Juarez, Mexico, without

10    approved waivers, assuring him multiple times they would not

11    schedule an appointment if they did not approve your waiver.

12         This is a direct quote.  That was a lie.

13         My father was denied and torn away from us.  Upon

14    finding out that may father's application was rejected, we went

15    to Mr. Amankwaa's office and explained the situation, only to

16    hear the words, it is not a big deal, come out of the

17    attorney's mouth.

18         The pain of the separation is unbearable.  My father

19    has missed birthdays, holidays, and will most likely miss my

20    graduation, an accomplishment I would not have been able to

21    achieve without my father's hard work and support.

22         THE COURT:  Is that coming up this spring?

23         MS. MIRANDA:  Yes.

24         THE COURT:  Congratulations in advance.

25    Congratulations.

1          MS. MIRANDA:  Thank you.

2          We have struggled emotionally and financially, my

3    mother having to search for employment at 60 years old.

4          THE COURT:  Does your mom have legal status here?

5          MS. MIRANDA:  Yes.

6          THE COURT:  She does.

7          So she was able to obtain a job?

8          MS. MIRANDA:  Yes; she has a job.

9          She didn't go through with him.  It was just my

10   father.

11         THE COURT:  Yes.  Okay.

12         MS. MIRANDA:  Having to search for employment at 60

13   years old, all because the attorney failed to do his job.

14         We are not alone.  He also took money from my extended

15   family, from my friends, and my community.  Most of them are

16   not here today, due to here fear.  He lied on their

17   applications and gave them nothing in return.

18         He preyed on the most vulnerable.  It is expected for

19   attorneys to follow the law, not agree to do so after being

20   caught.

21         Please hold him accountable.  No family should suffer

22   because of his greed and incompetence.

23         Thank you.

24         THE COURT:  Thank you very much.

25         Ms. Clancy, have I heard from the victims who wish to

P2qFamaS

1   speak today?

2          MS. CLANCY:  Yes.

3          THE COURT:  Thank you very much.

4          Mr. Margulies, have I received the entirety of the

5   government's sentencing presentation?

6          MR. MARGULIES:  Yes, your Honor.

7          THE COURT:  Did we lose your intern, sir?

8          MR. MARGULIES:  He had class.  He had to go, your

9   Honor.

10          THE COURT:  I will take no offense.

11          I'm sure he appreciate it would take the time that it

12   took.

13          Thank you so such.

14          Mr. Spodek I would welcome hearing from you, sir.

15          MR. SPODEK:  Yes.

16          Thank you, your Honor.

17          Your Honor, first and foremost, I want to let everyone

18   know that I have spent considerable time with Mr. Amankwaa,

19   going over this case, going over the victim impact statements,

20   and understanding what this or deal was like for each

21   individual who came to him.  He has expressed sincere remorse,

22   and you will hear from him, today, that remorse.  So that

23   doesn't go unnoticed, even to me as his lawyer, and is doesn't

24   go unnoticed to him.

25          As you sit and listen to each of the victims talk, and

P2qFamaS

1    you read the victim impact statements, it's hard to understand

2    the other side of him; right?  There's this balance of two

3    sides of on individual.  Certainly, there's the bad side that

4    is certainly clear here and clear from his actions in this

5    case, and then there's the good side, the good side that his

6    wife his adopted son, his daughters his family friends know,

7    the side that has been expressed in the 15 letters of support

8    that your Honor received, the side that has stood by him for

9    his 70 years of living here.

10           And this is his first contact, whatsoever, with the

11   criminal justice system.  So, for his entire adult life, he's

12   lived a law-abiding life, and you have to take a moment to

13   think about this situation from his perspective.  As he took a

14   plea in this case, facing what could be a considerable

15   sentence, he accepted responsibility early.  He pled guilty to

16   an information, and he took steps to right the wrong.

17           And that's all he could do in this situation.  He

18   can't go back in time.  He can't fix all of the problems that

19   everyone here faced, but he can try to rectify it.  He can come

20   to court, own his actions, take responsibility, and speak to

21   why he did it.  And that is what he did here, and I think that

22   is worth noting, Judge.  I think that does show something about

23   his character, that he would do this at this age.

24           I do want to talk briefly about the offense conduct

25   here.  As your Honor knows, prior to being a lawyer, he did

P2qFamaS

have strong employment.  He had always worked.  He emigrated
here legally and worked incredibly hard.

The conduct at issue here is from 2016 to 2023, so,
essentially, seven years of his life, so it's ten percent of
his life.

The rest of his life, by all accounts -- reading those
letters and understanding him from a different point of view in
the PSR showed that he was charitable, and he tried to do the
right thing by those around him, his family, the ones who cared
for him and the ones he cared for.

The immigration law firm that's the subject of this
case was run appropriately for 15 years without issue, so I
think it's a fair inference that in that 15 years, he also
helped some people and certainly did the right thing by those
people.

THE COURT:  Please excuse me.

MR. SPODEK:  I'm sorry, your Honor.

THE COURT:  Was it always focused on immigration, or
was it a more general practice?

MR. SPODEK:  It was an immigration law firm, your
Honor.

THE COURT:  Thank you.

MR. SPODEK:  And whenever I receive client in a
situation like this, someone who's lived a law-abiding life and
then, ultimately, decides to commit a criminal act and

certainly hurt people, people that are here today, it's hard to
understand what led someone to do that, and it's hard to
understand why someone would make those choices.

And I wish I had the perfect explanation; I truly do.
I spent a lot of time with Mr. Amankwaa trying to understand
things from his perspective.

He had a firm that was making money.  He had a family
that was blossoming.  He purchased a home in 2000, long before
this scheme.  I don't know what occurred.

I don't know what switched for him that he chose to go
down the path of criminal conduct.  What I do know is that
being an attorney is not an easy job.  I think everyone on this
side of the well can appreciate that.  I think that there is a
certain level of stress that comes with being an attorney who
deals with clients on a daily basis.

And by no means does this justify criminal conduct,
whatsoever, but it does lead to what happened here.  And I
believe what happened here is that at some point, Mr. Amankwaa
started to significantly abuse alcohol.  I think that's a fact.
And I think he went on autopilot.  He essentially wound up
having a stream of clients of Mexican heritage who came to him
for help, and he just did it, and he didn't necessarily think
it through.  And he made a reprehensible choice that clearly
has impacted lots of families here, and will, considering the
current climate.

1    And I think at some point, it just became the norm for

2   him, and he didn't reflect on it, and that's sad.  And it's sad

3   that he can't go back and change that.  But like I mentioned,

4   once he was prosecuted, he's given up his life.  He lost his

5   law license.  He's going to owe the government $15 million in

6   restitution or more.  He's going to have tremendous forfeiture;

7   any money that he receives in the future will be subject to it.

8    I think you could tell from looking at the liens and

9   looking at the current situation, his financial situation has

10  never been ideal.  And the government has vast resources to

11  uncover what happens to money, and I don't think there is any

12  money.  I think the money was spent, and I think that --

13    THE COURT:  That's the thing.

14    And maybe I've been a government employee for too

15  long, sir, but you can't drink $13 million in legal fees.

16    If you said to me, which -- don't do it now -- he

17  gambled it all away or he got involved in a cryptocurrency

18  scheme, then I can understand where the money went, but I

19  can't, for the life of me, figure out where the money went.

20    MR. SPODEK:  I agree.

21    THE COURT:  Okay.

22    MR. SPODEK:  And your Honor has a valid point.  I'm

23  not disputing that.

24    THE COURT:  But you don't know; do you?

25    MR. SPODEK:  But I don't know.  I don't have the

1    answer to that.

2         I don't think there's anything nefarious going on.  I

3    just don't think this is someone who's been very diligent with

4    their money.  From looking over their credit report and looking

5    over their lien history and tax history and lawsuit history, I

6    think this is someone who was not ideal with their money.

7         I'm sure that the law firm has other expenses,

8    vendors, other lawyers, paralegals, independent contractors.

9         But I don't have an answer for you, your Honor.  I,

10   unfortunately, don't.

11        THE COURT:  Okay.  And sir, realize that I'm not

12   intruding on your privileged communications, and I'm not asking

13   you to divulge information that you shouldn't, but there's no

14   way we can get any of this money back?

15        It's not in a mattress; I get that, but there --

16        MR. SPODEK:  Your Honor, as far as I know, there's no

17   way to claw this money back, as far as I know.

18        THE COURT:  Okay.

19        MR. SPODEK:  And we both are well aware, in other

20   cases -- including the cases that the government referenced in

21   their memorandum -- that paying back the legal fees could play

22   a role in your Honor's decision, whatever that may be.

23        So, this is something that he's aware of, that I'm

24   aware of, but is just not a reality here.

25        I think it's also worth noting here that even

1    probation questioned why he would continue this course of

2    action, knowing that so many petitions were withdrawn,

3    abandoned, denied, that there's no explanation that actually

4    makes sense here.

5         And that's a sad state of affairs of where he was in

6    his life, meaning, he knew very well that a lot of these

7    petitions were not going to get approved.  In fact, he was

8    responsible for half of the withdrawn petitions nationwide.

9    So, it's almost like he wasn't thinking.  He wasn't rationally

10    thinking about his decisions.  And that is unfortunate, and

11    that is what leads us here today.

12         And certainly, by him doing that, it's going to change

13    his life forever.  Not only has it changed the life of all of

14    the victims here -- and I certainly can understand that -- but

15    it's changed the life of his family members, too, and the

16    people that support him.

17         He's 70 years old.  He's not in the best health.  Your

18    Honor understands his medical conditions, and he very well may

19    spend the last years of his life in a federal prison.

20         As your Honor is aware, his son is a codefendant in

21    this case.  He's facing considerable exposure.  As you can

22    imagine, that that has strained their relationship.

23         The restitution and forfeiture are life-changing

24    numbers.  He'll be indebted to U.S. government for the rest of

25    his life.

1    If he is incarcerated, he will not receive Social

2 Security, so his wife, Beatrice -- who I introduced earlier --

3 she'll have to survive on her Social Security alone.

4    And certainly, he made the choices he made, and that

5 bears on him.  That's no one else's fault but him, but I do ask

6 your Honor to take that into consideration, because the idea is

7 to fashion a sentence that's sufficient but not greater than

8 necessary.

9    Your Honor, his wife is of limited mobility, and she

10 will need help.  He won't be there to help her if he is

11 incarcerated, regardless of the amount of time.  The children

12 have all left the home, so no one will be there, and I just ask

13 that you take that into consideration.

14    I want to just touch, quickly, on the alcohol abuse

15 that I know existed and that is referenced in the PSR.  This is

16 someone who's been drinking for 49 years, starting at 20 years

17 old until, basically, last year.  So, that's a long time.  This

18 is someone whose admitted to drinking half a pint of cognac and

19 half a point of Jägermeister daily.

20    Did your Honor have a question?

21    THE COURT:  No.  No.

22    It was the visual of that, so.

23    Yes.

24    MR. SPODEK:  This is someone who's been hospitalized

25 for alcohol withdrawal, including tremors.  This is someone

1    who's been prescribed naltrexone, which is used to assist in

2    alcohol dependency.

3          And again, the unique thing about being a lawyer is

4    that there are hotlines available for lawyers for this specific

5    reason.  It's the one profession where the reality is, stress

6    can play a role, and alcoholism and drug abuse and mental

7    health issues is rampant.

8          And unfortunately, he didn't avail himself of any of

9    those things early in life or early in his career, and he let

10   this spiral out of control.  And his alcoholism didn't cause

11   the events that occurred here, but I submit, it did play a

12   role.

13         I ask your Honor to take into consideration that for

14   someone who's never spent a night in prison, specific

15   deterrence, I don't think, will be a paramount concern here.

16   Any federal prison sentence will be adequate deterrence for

17   him.

18         And I think from a general deterrence point of view,

19   this is a case that's received a lot of media attention.  Any

20   lawyer who's considering committing fraud against the

21   immigration authorities knows that the federal government's

22   going to investigate.  You they're going to prosecute you.

23   You're going to lose your law license.  You're, likely, going

24   to go to federal prison for a long time.  You're going to owe

25   restitution and forfeiture.  And I think all of those things

1  play a role in general deterrence.

2         I ask your Honor to take into consideration all of

3  these things in fashioning an appropriate sentence, and

4  considering the words -- when he has the time to speak -- and

5  understanding how someone in his shoes could turn to this.  How

6  someone who lived a law-abiding life and who received the

7  benefits of the immigration system came here and did this.

8         And Judge, I'm happy to answer any questions, but I

9  don't want to trespass too much on your Honor's time.

10        THE COURT:  Oh, no.

11        Take whatever time you need, sir.  I want make sure

12 you've made all your points.

13        I asked you the questions that I had at the beginning

14 of the proceeding.

15        MR. SPODEK:  Yes, your Honor.

16        THE COURT:  And you were you kind enough to answer

17 them, so I don't believe I have additional ones occasioned by

18 the statements of the victims.

19        I think we all just have the question that I think

20 you're telling me can't be satisfactorily answered, which is,

21 how did this happen?

22        MR. SPODEK:  I feel like I'd be a much more successful

23 lawyer if I had the answer to that question for all of my

24 clients, but I don't.

25        And I think that a number of things were happening at

1    that time that led Mr. Amankwaa to make that decision.  And

2    hopefully, in his statement, he will be able to address the

3    victims, address your Honor, and address the government in some

4    way that provides some relief to everyone.

5           Thank you, your Honor.

6           THE COURT:  Mr. Amankwaa, having spoken with your

7    attorney, he advises me that you would like to speak this

8    afternoon.  Please know, sir, you're not obligated to speak

9    with me, but you're invited to do so, and if you do, I will

10   take carefully what you have to say.

11          What I will ask, sir, as I have said to so many people

12   who have spoken this afternoon is, the courtroom has some

13   issues with acoustics, and everyone wants to hear you, so I

14   would ask you to speak slower and louder than you think you

15   need to.

16          And I invite you to remain seated and to bring the

17   microphone closer, because I think that may be easier for you.

18          Is that acceptable to you?

19          THE DEFENDANT:  Yes, your Honor.

20          THE COURT:  And is it your wish to speak, sir?

21          THE DEFENDANT:  Yes, your Honor.

22          THE COURT:  We will hear you at this time.

23          Thank you.

24          THE DEFENDANT:  Good afternoon.

25          THE COURT:  Good afternoon, sir.

1          THE DEFENDANT:  Judge, I am grateful for this chance

2     to speak directly to your Honor.

3          Before I say anything else, I would like to apologize

4     to my victims, sincere apology, these victims who were my

5     clients.

6          These people trusted me to always have their best

7     interests in mind and guide them through the immigration system

8     of this country.

9          I also want to apologize to my son who I put on this

10    path, as no father should.

11         I pled guilty to one count of immigration fraud,

12    because I mean undeniably guilty of this crime and because my

13    actions wronged countless people who put their trust in me and

14    were betrayed.

15         Since my arrest, I've had ample time to understand the

16    true extent of my wrongdoing.  My selfishness put many lives in

17    jeopardy and affected entire families and communities.

18         I am ashamed of my role in the instant offense and

19    appalled by the choices I deliberately made, which I knew to be

20    illegal.

21         My decisions affected my clients, the victims, who

22    trusted me and the people in my life who believed in me to be a

23    moral and good man.  I betrayed my clients, my family, my

24    friends.  I feel failed miserably as a lawyer and as a human

25    being.

1    When I arrived in this country, I dreamed of becoming

2  a lawyer.  I wanted to help people, fellow immigrants, not hurt

3  them or mislead them.

4    My actions in the instant offense do not reflect the

5  pure intentions that I had when I started my career.  Moreover,

6  I violated the laws of this country which welcomed me and has

7  been so good to me and my family.

8    Admitting my transgressions is only the first step.

9  Work to find the wrongfulness of my conduct and the harm I

10  caused many people is necessary.  The victims endured serious

11  distress and untold pain for which I am responsible and no one

12  else.

13    Over the past year or so, I've reflected deeply on

14  this matter, my culpability, and the many factors that

15  contributed to my reckless behavior and decision making.

16    I succumbed to a demon called alcoholism, which has

17  affected my judgment for the better part of 40 years.  With the

18  encouragement of my wife and four adult children, other member

19  family members, and close friends, I have started my path

20  towards recovery.  I'm now confronting this demon head-on.

21    Since my discharge from rehabilitation, I've proceeded

22  to attend Alcoholics Anonymous meetings.  My new-found sobriety

23  has allowed me to understand how detrimental my conduct was for

24  my clients and loved ones.  I have not touched a drop of

25  alcohol since last summer.  These steps, I believe, will help

1    me redeem myself going forward, regardless of the sentence that

2    your Honor fashions for me.

3          I would be remiss if I did not emphasize that I

4    sincerely apologize to my victims who were my clients and

5    deserve so much better and their families, for the harm I have

6    put them through.

7          I sincerely regret my behavior and seek forgiveness

8    from God, from this Court, from the victims, and from my

9    family.

10          Thank you very much.

11          THE COURT:  Sir, thank you very much.

12          Mr. Spodek, just a clarifying question, because I

13    think it's easier for me to direct them to you rather than your

14    client.

15          Is your client's belief that he was just -- I don't

16    have a sense of whether the alcohol he consumed was done

17    throughout the day or just in the evening, you know, late at

18    night.  Is the argument that he was a functioning alcoholic at

19    work every day, or that his nighttime overconsumption caused

20    him to come to the office with, perhaps, lessened

21    sensibilities.

22          And I'm just trying to figure it out.  I mean, were

23    his clients supposed to know?

24          MR. SPODEK:  No, your Honor.

25          THE COURT:  Okay.

P2qFamaS

1           MR. SPODEK:  And as far as I understand, he was

2    drinking heavily at evenings, not during the day.

3           And certainly, to be clear, his alcohol consumption is

4    not why he made these choices and why he did this conduct, but

5    it certainly clouded his judgment over a span of time.  And

6    that's all we want to bring to your Honor's attention.

7           THE COURT:  I appreciate the clarification, sir.

8           Thank you very much.

9           May I ask you, please, to confer with Mr. Amankwaa and

10   be sure that everything you wanted me to know, I now know.

11          MR. SPODEK:  Yes, your Honor.  Of course.

12          (Counsel conferred with the defendant)

13          MR. SPODEK:  Judge, we have nothing further.

14          Thank you.

15          THE COURT:  Thank you very much.

16          Counsel, as you're aware, and as Mr. Amankwaa will now

17   be aware, I do not come on the bench with a sentence already

18   picked.  I do need to think about everything I've heard,

19   because I believe that the fairest thing for me to do is be

20   open minded.

21          So I appreciate that many of you have stayed here for

22   a period of hours this afternoon.  I thank you for doing that.

23          I'm going to take a break to think about the

24   appropriate sentence, and I imagine that I will be off the

25   bench about ten minutes or so.

P2qFamaS

1    If your schedule does not permit you to remain, you

2  may leave.  I will take no offense, and I thank you very much

3  for being here.  If you wish to stay, you're also welcome to do

4  that, but I will be back in about ten minutes.

5    I'm not doing this it heighten anyone's anxiety; I

6  just think it's the fairest thing for me to do.

7    So, please excuse me.

8    We'll let you know what I'm coming back.

9    Thank you.

10    (Recess)

11    THE COURT:  What I'm going to do is outline the

12  sentence that I intend to impose, but I will give each side an

13  opportunity to make legal objections before the sentence is

14  actually imposed.

15    One of the things that I have to do in sentencing

16  someone is to consider the factors that are set forth by

17  Congress in § 3553(a) of Title 18 the United States Code.

18  These factors include: the nature and circumstances of the

19  offense; the history and characteristics of Mr. Amankwaa; the

20  need for the sentence imposed to reflect the seriousness of the

21  offense; to promote respect for the law; to provide a just

22  punishment for the offense; to afford adequate deterrence to

23  criminal conduct; to protect the public from further crimes by

24  Mr. Amankwaa; to provide him with needed education, vocational

25  training, medical care, or other correctional treatment.

P2qFamaS

1    I must consider the sentencing guidelines, which I'll

2    speak about in a moment.  I must consider the need to avoid

3    unwarranted sentence disparities among similarly-situated

4    defendants, and I must consider the need to provide restitution

5    to the victims.

6    My guidelines calculations, I believe, accord with

7    these in the plea agreement in this case.  There is a base

8    offense level of 11 under guidelines section 2L2.1.  There is a

9    nine-level enhancement for the number of documents, respecting

10   the number of clients.  There is a two-level enhancement for

11   vulnerable victim.  There is a two-level enhancement for more

12   than 3,000 vulnerable victims.  There is a four-level

13   enhancement for organizer or leader of a criminal activity that

14   involved more than five people or was otherwise extensive.

15   There was a two-level enhancement for abuse of trust.  There is

16   a three-level reduction for acceptance of responsibility, which

17   yields an adjusted offense level of 24.

18   There are no criminal history points for Mr. Amankwaa,

19   which places him in Criminal History Category I.

20   The resulting guidelines range with an offense level

21   of 24 and a Criminal History Category of I is 70 to 87 months'

22   imprisonment.  The probation office recommended a sentence of

23   36 months.  The defense has asked for a significant downward

24   variance from the guidelines.  The government is asking for a

25   sentence within the guidelines range of 70 to 87 months.

1          And as I noted a few moments ago, I really do

2     appreciate you staying this afternoon.

3          Oh, I'm sorry.

4          Mr. Margulies --

5          MR. MARGULIES:  I believe you said 24 for the offense

6     level; I believe it's 27.

7          THE COURT:  27.

8          You know what, I managed to deduct the three points

9     twice, so it is -- there was a 30 adjusted offense level

10    yielding, after acceptance of responsibility, 27 so I managed

11    to deduct the three points twice.

12         Excuse me, all.

13         It is, 27 is the offense level.  I is the Criminal

14    History Category.  The guidelines range remains 70 to 87

15    months.

16         And so going back to my thanks to those of you who've

17    stayed this afternoon, and those of you on all sides who have

18    given me a complete -- as complete as I can have -- insight

19    into the good and the less good.

20         And I have to say -- and I know, for Mr. Amankwaa,

21    there's just so much of his life that is a triumph.  When I

22    think about his childhood and, sort of, the chaos of his

23    childhood, when I think about the fact that he was able to come

24    to this country and to get a great education in Ghana and then

25    to continue it here, and then to build a home and a family and

1  a life here, I think these are all such great triumphs over the

2  obstacles that were placed in his path.

3      And I think one of the problems that I've had is that

4  it makes the conduct in which he engaged so egregious.

5  Obviously, Mr. Amankwaa abused his position of trust as an

6  attorney.  But as one of the speakers noted this afternoon, he

7  deceived others into believing that they, too, could obtain

8  what he had received in terms of a welcome to this country and

9  status in this country.

10      Mr. Amankwaa exploited his clients' lack of knowledge

11  of the law and his clients' lack of knowledge of English.  He

12  took money with false promises of a loophole that just does not

13  exist.  He had his clients lie about abuse, oftentimes, without

14  their knowledge.

15      When things went bad, he strung them along.  One of

16  the things I didn't really appreciate until I listened to folks

17  this afternoon is how much folks were stripped of their dignity

18  in terms of the way in which he had these cattle calls in his

19  offices and wouldn't really give them correct answers.  And all

20  of that is just so unfortunate, because again, he triumphed

21  over so much.  It's just such a shame that it came to that.

22      I just want to pause for a moment and just acknowledge

23  the folks who've spoken to me this afternoon.  It must have

24  been very hard for you to speak to me, and I appreciate the

25  efforts.

1    And many of you spoke on behalf of relatives who could

2 not or were afraid to be here today.  To me, you are great

3 credits to the way in which they raised you.  You are, to me,

4 their greatest success.  And I hope you know that.  And it was

5 my privilege to hear from you all this afternoon, so I do thank

6 you very much for explaining to me just how serious this was.

7    And Mr. Spodek did a wonderful job talking about his

8 client and what he had suffered and what he has to look forward

9 to, and I appreciate that.

10    I guess the answer is that there really is no

11 explanation that's fully satisfying for what happened.

12    I think it's very difficult for Mr. Amankwaa to say he

13 thought he would be helping these thousands of clients.  There

14 was no loophole.  The statements were false.  He lied to his

15 clients.  He lied to the government.  He lied to many people.

16 Even after one of his clients had been detained, he continued

17 the scheme.  Seven years.  Thirteen-plus million dollars.  Now,

18 alcoholism, it might contribute, but it certainly doesn't

19 justify or explain this.

20    I have, instead, looked to other mitigating factors.

21 Mr. Amankwaa has a family who, obviously, loves him very much

22 and whom he loves and who have supported him throughout this.

23 He has friends who have attested to the good things that he has

24 done.  He has a community who has talked about the benefits he

25 has given to them.

1            I do understand that specific deterrence really isn't

2     an issue here.  I do understand that there are collateral

3     consequences to his family of any absence that he would have.

4            But having reflected on this issue for the better part

5     of the last week, the conduct is so bad.  The zone of

6     destruction is so extensive, and the need for respect for the

7     law is so important that I'm not going below the guidelines in

8     this case.

9            And so I intend to impose a term of 70 months'

10    imprisonment followed by a term of supervised release of three

11    years with the mandatory, standard, and special conditions

12    we've talked about earlier that were slightly modified.

13           I am going to defer the issue of restitution.  I'm

14    going to order forfeiture in the amount of $13,389,000,

15    pursuant to the consent preliminary order of forfeiture I

16    entered earlier.  I'm not imposing a fine, because I don't

17    think that would be useful here.  I am obligated to impose a

18    $100 special assessment.

19           Mr. Margulies, is there any reason why I may not

20    impose that sentence?

21           MR. MARGULIES:  No, your Honor.

22           THE COURT:  Mr. Spodek, is there any legal reason why

23    I may not impose that sentence?

24           MR. SPODEK:  No, your Honor.

25           THE COURT:  Mr. Amankwaa, please rise.

P2qFamaS

1          Mr. Amankwaa, after reviewing the guidelines and the

2     factors set forth in § 3553(a) of Title 18 of the United States

3     Code, I find that the term of 70 months' imprisonment is

4     sufficient but no greater than necessary to comply with all of

5     the purposes of sentencing.

6          That term of imprisonment will be followed by a term

7     of supervised release of three years with the mandatory,

8     standard, and special conditions that are set forth in the

9     presentence investigation report.

10          I am not imposing a fine.  I am deferring restitution

11     until a later date.  I am recording forfeiture in the amount I

12     stated earlier, and I must impose a $100 mandatory special

13     assessment.

14          Do you understand that, sir?

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  Please be seated, sir.

17          Mr. Amankwaa, except to the extent that you may have

18     waived this in any plea agreement that you have with the

19     government, you have a right to appeal from your conviction and

20     from your sentence.  If an appeal is something in which you're

21     interested, please speak with your attorney, because he's

22     familiar with the process by which an appeal is taken.

23          Please understand, sir, that you, generally speaking,

24     have two weeks from the date the written judgment is entered in

25     order to file a notice of appeal.

1    I imagine I'll be entering the judgment probably later

2  this week, although it may not be fully complete without the

3  restitution order, so I may have to enter an amended judgment

4  at a later date.  But the point is, if you care about appeal,

5  speak with your attorney.

6    Mr. Spodek, you have asked me to recommend placement

7  in an RDAP program, which I will.

8    I believe, as well, sir, you've asked me to recommend

9  placement in FCI Fort Dix, FCI Fairton, or FCI Danbury in the

10  camps that are there; is that correct?

11    MR. SPODEK:  Yes.

12    THE COURT:  I will make those recommendations.

13    MR. SPODEK:  Thank you.

14    THE COURT:  May I hear from you, sir, about a proposed

15  date for surrender?  What I will say -- not to cut you off;

16  excuse me -- is simply that I've been seeing -- perhaps you've

17  had different views, you and Mr. Margulies -- it's been taking

18  about ten weeks to get a designation.  I don't know if that

19  would be affected by the restitution; I don't think it would.

20    But may I ask you, have you spoken with your client

21  and the government about a date?

22    MR. SPODEK:  Yes, Judge.

23    I agree that 10 weeks is somewhat standard.  I would

24  ask for 90 days.

25    I did speak to the government about it, and I believe

P2qFamaS

1    they don't have an objection.  This will allow him to have his

2    affairs in order and deal with the medical issues that him and

3    his wife have before he --

4              THE COURT:  Okay.  So, late May, early June.  Okay.

5              Ms. Noriega, may I have a date, please?

6              THE DEPUTY CLERK:  May 30, before 2 p.m.

7              THE COURT:  Mr. Spodek, I'm going to tell you what you

8    know already, and Mr. Amankwaa will is hearing this as well.

9    If this is one of those rare situations where your client has

10   not received a designation by late May, please reach out to me.

11             I don't want him surrendering to a random federal

12   facility.  I want to be sure he has a place of designation, so

13   we'll simply extend the surrender date if it hasn't been

14   arrived at yet.

15             MR. SPODEK:  Yes, your Honor.

16             THE COURT:  Okay.  Thank you.

17             Are there other recommendations, sir, that you would

18   like me to make?

19             MR. SPODEK:  No.

20             Those were it, your Honor.

21             THE COURT:  Mr. Margulies, this was a plea to an

22   information, so I don't believe there are charging instruments

23   to dismiss, but I'll hear from you if you believe otherwise,

24   sir.

25             MR. MARGULIES:  That's correct, your Honor.

1          THE COURT:  Okay.

2          I thank you so much for your time this afternoon and

3   for the efforts of your office.

4          Sir, is there anything else, from your perspective,

5   that I should be doing?

6          MR. MARGULIES:  No, your Honor.

7          Thank you.

8          THE COURT:  Thank you.

9          Mr. Spodek, from your perspective, sir, anything else

10  I should be doing?

11         MR. SPODEK:  No, your Honor.

12         Thank you.

13         THE COURT:  I thank all of you who have stayed this

14  afternoon.

15         Mr. Amankwaa, I wish you well.

16         I say to people, and I will say it to you, it is my

17  hope to never see you in this context again.  I'm sure --

18  because it would be a supervised release violation -- I know

19  you don't want to do that, so I'm simply going to wish you and

20  your family well.

21         I thank you.

22         We're adjourned.

23         (Adjourned)

24

25